# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

———————

No. 95-3678

———————

Paul Handeen,                          *
                                       *
        Plaintiff - Appellant, *
                                       *
    v.                                 *
                                       *
Gregory A. Lemaire; Henry        *  Appeal from the United
Lemaire; Patricia Lemaire,       *  States District Court for
                                 *  the District of Minnesota.
        Defendants,              *
                                 *
Orlins & Brainerd Law Firm;      *
Richard K. Brainerd; Peter       *
I. Orlins,   *
                                 *
        Defendants - Appellees.*

———————

Submitted:  October 23, 1996

Filed:  May 7, 1997

———————

Before  RICHARD S. ARNOLD, Chief Judge,  FLOYD R.  GIBSON, and  MORRIS
    SHEPPARD ARNOLD, Circuit Judges.

———————

FLOYD R. GIBSON, Circuit Judge.

    Paul Handeen appeals the district court's order granting summary judgment in favor of the Orlins & Brainerd Law Firm and its principals (collectively the "Firm") on his claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968 (1994 & Supp. I 1995), and various other

provisions of federal and Minnesota state law.[1]  Given the procedural
posture of this case, we find ourselves constrained to reverse the district
court's dismissal of Handeen's RICO and state law causes of action, but we
otherwise affirm.

## I.  BACKGROUND

The appeal before us traces its genesis to a series of unfortunate
events that has already been the subject of extensive litigation in this
Court,  see Handeen v. Lemaire (In re Lemaire), 898 F.2d 1346, 1347-48 (8th
Cir.  1990)(en  banc)("Lemaire  II")(describing  underlying  factual
foundation), rev'g 883 F.2d 1373, 1375-76 (8th Cir. 1989)(containing
further elaboration), and we see no present need to retell that sorry tale.
Suffice it to say that Gregory Lemaire (individually referred to as
"Gregory" or "Lemaire") set out to execute Handeen on July 8, 1978, and he
very nearly succeeded.[2]  As a result of this intentional deed, Lemaire

---

[1]The court's order did not dispose of Handeen's claims
against Gregory Lemaire and his parents, Henry and Patricia, who
were originally named as defendants in the Complaint.  Handeen,
though, voluntarily dismissed his grounds for relief against the
three Lemaires pursuant to a Pierringer settlement.  See
Pierringer v. Hoger, 124 N.W.2d 106 (Wis. 1963).

[2]Lemaire represented himself pro se in the instant action,
and one of the numerous documents he filed with the district
court is a rambling, thirty-one page Answer recounting with
chilling detail his version of the events which transpired on
that summer day:

> The rifle was a semi-automatic, .22-calibre rifle that
> I had purchased many years before for the sole purpose
> of shooting at tin cans with my friends.  The rifle was
> capable of holding 16 bullets . . . .  Prior to the
> shooting, I had loaded bullets into the gun in the
> front seat of my car; in checking that a bullet was in
> the chamber, I had ejected one bullet, which landed on
> the floor on the passenger's side of the front seat.
> When I began shooting at Mr. Handeen, it was from the

pleaded guilty to a charge of aggravated assault and spent twenty-seven months in a Minnesota prison. Following his release, Lemaire resumed his graduate studies at the University of Minnesota and in January 1986 received a doctoral degree in, of all things, experimental behavioral pharmacology.

Handeen filed a civil suit against Lemaire and obtained a consent judgment in excess of $50,000. Lemaire used funds received from his father to pay an initial lump sum of $3,000 due under the judgment, but he failed to remit any agreed-upon monthly installments. This prompted Handeen to commence garnishment proceedings to collect the balance due him. Lemaire, who was represented by the Firm, filed a Chapter 13 bankruptcy petition shortly thereafter, and the bankruptcy court, over Handeen's objections, approved Lemaire's repayment plan. The district court and a divided panel of this Court affirmed the bankruptcy judge's decision, see Handeen v. Lemaire (In re Lemaire), 883 F.2d 1373

---

> car in which I sat, perhaps 150-200 feet away from him. I then left the car and ran toward him, continuing to shoot. At some point in my approach to him, there were no more bullets left in the gun. I ran back to the car, picked up the single remaining bullet from the floor of the car, placed it in the chamber of the rifle, and ran to Mr. Handeen. At the instant that I came to stand directly over Mr. Handeen, there was no thought involved: I clipped-on the safety mechanism of the rifle and placed it on the roof of Mr. Handeen's car, which was directly adjacent to us. From then on, I agitatedly paced back and forth in the street with raised hands, yelling to Mr. Handeen (who repeatedly atempted to rise), "Stay down![] Stay down! The ambulance is coming!" . . . . I evidently did fire nine shots with the intent to execute Mr. Handeen; I did not fire the tenth shot, which would have done so.

Gregory Lemaire's Answer at 4. Upon reading Lemaire's submissions to the district court, one comes away with the distinct impression that he considers himself the primary victim in this affair. This is a sentiment we do not share.

(8th Cir. 1989)("Lemaire I"), rev'd en banc, 898 F.2d 1346 (8th Cir. 1990), but upon rehearing en banc we determined that Handeen had not proposed the Chapter 13 plan in good faith, see Lemaire II, 898 F.2d at 1352-53. Accordingly, we reversed the order confirming the plan and remanded the case for further proceedings. Id. at 1353. On July 19, 1990, the bankruptcy judge vacated the plan and dismissed the petition.

Handeen initiated this suit against the Firm and the Lemaires on October 16, 1992. The Complaint paints a sordid portrait of an intricate scheme through which Lemaire sought to fraudulently obtain a discharge of Handeen's judgment by manipulating the bankruptcy system.[3] As part of this plot, the Firm and the Lemaires contrived to minimize whatever reduced recovery Handeen might achieve via the bankruptcy process. To this end, the Firm instructed Gregory to inflate the amount of his debts by agreeing to pay his parents rent and by executing a false promissory note payable to the elder Lemaires.[4] Gregory listed his parents as creditors on schedules he filed with the bankruptcy court,[5] and the Firm relied on the parents' claims when preparing proposed

---

[3]As we explain below, at the current stage of these proceedings we must accept as true all of the allegations within the Complaint. We pay homage to this requirement during our recitation of the salient facts.

[4]Gregory had never before paid his mother and father rent for the privilege of living in their home. Furthermore, the promissory note was dated January 15, 1987, only one day prior to the date Gregory filed for bankruptcy protection.

[5]The Complaint also indicates that the Firm advised Gregory not to disclose on his schedules a contingent debt in the amount of $30,000 to $50,000 which he would have been obligated to repay to the United States Public Health Service if he failed to fulfill the terms of a fellowship stipend. This obscuration could have resulted in discrimination among creditors. See Lemaire II, 898 F.2d at 1350 n.5.

-4-

repayment plans. Of course, to the extent the bankruptcy court recognized this "indebtedness," it would reduce Handeen's pro rata share of any Chapter 13 distributions. Indeed, the cabal enjoyed success in this venture, for the bankruptcy court in substantial measure approved the parents' petitions against the estate.[6] As such, Gregory's parents received a portion of the sums he paid under the approved plan, and they compounded the fraud by transferring much of this money back to Gregory.

The intrigue, however, does not end there. In 1989, while Handeen was appealing the bankruptcy court's confirmation of the Chapter 13 plan, Gregory found a new job which required him to relocate from Minneapolis to Houston, Texas. This employment significantly enhanced Lemaire's income. Nonetheless, presumably because a person who takes refuge in Chapter 13 must ordinarily devote to the repayment plan "all of the debtor's projected disposable income," 11 U.S.C. § 1325(b)(1)(B) (1994),[7] Lemaire did not wish to reveal his increased wages to the bankruptcy trustee. Consequently, Lemaire, his parents, and the Firm formulated an artifice to avoid rousing the trustee's attention. Specifically, the ruse called for Lemaire to mail his father a parcel every month. Within that package would be an envelope addressed to the bankruptcy trustee and containing a check representing Lemaire's monthly payment under the plan. Lemaire's father would, in turn, place the enclosed envelope in the mails, and the trustee would

---

[6]The Firm also represented Henry and Patricia Lemaire before the bankruptcy court, and it therefore defended their claims against objections lodged by Handeen.

[7]To be sure, § 1325(b)(1)(B) speaks of the debtor's "projected disposable income" at the time the plan first takes effect. Section 1329, though, allows an unsecured creditor or the trustee to proffer a postconfirmation motion for modification of the plan. See 11 U.S.C. § 1329(a)(1) (1994).

thus receive a letter postmarked from Minneapolis rather than Houston. The object, it is clear, was to fool the trustee into believing that the status quo ante existed, and this exploitation of the postal service remained a monthly ritual until the court dismissed Lemaire's plan in July of 1990.

In his Complaint, Handeen charges that the Firm and the Lemaires, through their duplicitous association with Gregory's bankruptcy estate, violated 18 U.S.C. § 1962(c) by conducting a RICO enterprise (the estate) through a pattern of racketeering activity. Handeen also alleges that the group conspired to violate RICO in violation of 18 U.S.C. § 1962(d). On summary judgment, the district court dismissed these claims against the Firm based on its determination that Handeen had failed to demonstrate "the existence of a pattern of racketeering separate and apart from the bankruptcy estate." At the same time, the district court rejected Handeen's attempt to obtain an augmented recovery under two provisions of Minnesota state law that subject unscrupulous attorneys to severe monetary penalties. See Minn. Stat. Ann. §§ 481.07-.071 (West 1990). The court decided that the statutes in question merely authorize treble damages in certain civil suits and do not create independent causes of action. Thus, because the district court believed that Handeen did not attempt to ground his state law action upon a separate tort, but instead merely invoked the two damages provisions, the court found summary judgment appropriate.

Handeen now appeals the district court's dismissal of his RICO and state law causes of action.[8]  We reverse the court's grant of summary judgment on these claims.

## II.  DISCUSSION

### A.  Procedural Considerations

Before taking up the merits of Handeen's appeal, we must first focus on a procedural question of significant import in the context of this case. At oral argument, counsel for the Firm mentioned that Handeen's response to the motion for summary judgment, along with all accompanying submissions, failed to establish the existence of a "factual record warranting trial."  Based upon our review of these materials, we wholeheartedly agree with this suggestion.  The response makes no effort to demonstrate, through citation to affidavits, depositions, answers to interrogatories, or admissions on file, any "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  It is true that Handeen supplemented his response with certain affidavits and other papers extraneous to the pleadings.  Still, these documents are

---

[8]The district court dismissed, as well, each of the many additional claims included within Handeen's Complaint.  With one exception, Handeen does not challenge the district court's rulings on those counts.  He does, however, appeal the district court's decision to grant summary judgment on a theory of recovery he struggled to forge from Rule 11 of the Federal Rules of Civil Procedure.  We summarily affirm this aspect of the district court's judgment, because "Rule 11 sanctions must be sought by motion in a pending case; there can be no independent cause of action instituted for Rule 11 sanctions."  Cohen v. Lupo, 927 F.2d 363, 365 (8th Cir.), cert. denied, 502 U.S. 861 (1991); see also Port Drum Co. v. Umphrey, 852 F.2d 148, 150 (5th Cir. 1988)("[T]he rule's primary purpose is to discourage groundless proceedings rather than to compensate wronged parties by means of affirmative relief.").

largely irrelevant to the essential elements Handeen will be required to prove in order to prevail, and he appears to have included most of them to provide support for tangential matters not currently in issue. Accordingly, were this a typical summary judgment case, we would have no difficulty with affirming the district court's judgment in toto. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

This is not, however, a typical summary judgment case. We have also had occasion to inspect the Firm's summary judgment motion, and we are convinced that, for present purposes, it would be entirely unfair to hold Handeen accountable for a factual showing that would, under normal circumstances, be inadequate. This is because the Firm's motion shares, and probably engendered, the exact flaw contained in Handeen's response: It is almost entirely bereft of any citations to relevant portions of the record.[9] In fact, the Firm went so far as to introduce its argument section with an express affirmation that

> [r]esolution of th[e] motion does not depend upon the outcome
> of any disputed question of fact. Instead, it requires only
> the application of established principles

---

[9]The district judge was correct in treating the Firm's filing as a motion for summary judgment because "matters outside the pleadings [were] presented and not excluded by the trial court." Gibb v. Scott, 958 F.2d 814, 816 (8th Cir. 1992)(quotation omitted); see also Fed. R. Civ. P. 12(c). Similar to Handeen's response, the materials submitted and cited by the Firm deal primarily with matters of historical fact not currently in dispute.

> of law to the allegations contained in [Handeen's] Complaint. Such application demonstrates that [Handeen] has failed to state a claim against [the Firm] upon which relief can be granted . . . .

The Firm's Summ. J. Mot. at 6. This evolved into the dominant theme underlying the Firm's motion, as it is readily apparent that, for whatever reason, the Firm chose to eschew reliance on the recently alleged absence of a "factual record warranting trial," and instead emphasized what were perceived to be "an array of patently untenable legal theories." Id. at 1. This is a common refrain throughout the Firm's motion; the document repeatedly accepts as true contentions within the Complaint and endeavors to show why those undisputed facts cannot support a recovery. See, e.g., id. at 16 (assuming as accurate the "'enterprise' alleged by plaintiff" and maintaining that Handeen cannot prevail "[e]ven if the [Firm] had engaged in the acts described in [his] Complaint.").

It is evident, then, that the Firm failed to meet the prefatory burden contemplated by Rule 56. The Supreme Court has explained that one who moves for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record as specified in Rule 56(c)] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (quotation omitted). The standard is far from stringent, for it is sufficient if the movant points out "that the record does not contain [a genuine issue of material fact] and . . . identif[ies] that part of the record which bears out his assertion." City of Mt. Pleasant, Iowa v. Associated Elec. Coop., Inc., 838 F.2d 268, 273 (8th Cir. 1988). This is an obligation regularly discharged with ease by parties who desire summary judgment, but it is one

that went unsatisfied in this case.[10]  By founding the summary judgment motion on a theory which accepted for purposes of argument the veracity of allegations within Handeen's Complaint, and by posing no alternative grounds for the requested action, the Firm neglected to pinpoint those portions of the record that might have revealed the absence of a genuine factual issue.[11]

Due to the Firm's failure to meet its initial burden, the onus never passed to Handeen to "set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  Only after the moving party fulfills its duty is the nonmoving party obliged to "proffer evidence that contradicts the moving party's showing and that

---

[10]It is possible to construe the Firm's motion as an effort to show that the facts alleged by Handeen, though disputed, are not material.  Phrased differently, it might have been the Firm's unstated intention to establish that the contentions in the Complaint are so intrinsically deficient that they could not "affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Even viewed in this charitable fashion, the Firm failed to satisfy its burden, because our interpretation of RICO law reveals that the allegations are, in fact, material.  That is, the Complaint could support a recovery under RICO.

[11]There are, without a doubt, cases in which the defendant truly does not dispute the plaintiff's characterization of relevant events.  As a consequence, the parties reach an agreement, perhaps implicitly, that there is no genuine issue for trial.  Under those circumstances, because it would be senseless and wasteful for the litigants to submit the matter to a trier of fact, it is common for the district court to render summary judgment for one side or the other, often on a set of stipulated facts.  Therefore, it is important to stress our confidence that the Firm's concessions were for purposes of argument only.  That is, we do not believe the Firm intended to make a binding admission that the representations in the Complaint are true. The most cursory review of the record discloses that the Firm does, indeed, challenge the accuracy of many of Handeen's claims. Were the situation otherwise, under our analysis of RICO law, summary judgment against the Firm would be proper.

proves the existence of a genuine issue of material fact." <u>McKinney v.</u> <u>Dole</u>, 765 F.2d 1129, 1135 (D.C. Cir. 1985). "[E]ven when the non-movant bears the burden of proof at trial, simply filing a summary judgment motion does not immediately compel the party opposing the motion to come forward with evidence demonstrating material issues of fact as to every element of its case." <u>Ashe v. Corley</u>, 992 F.2d 540, 543 (5th Cir. 1993)(quotation and alteration omitted); <u>see also</u> <u>New Burnham Prairie Homes, Inc. v. Village</u> <u>of Burnham</u>, 910 F.2d 1474, 1477 (7th Cir. 1990)(recognizing that the nonmovant must show the existence of an issue warranting trial only after the movant has met its burden). Any contrary rule would be fundamentally unfair and would permit a defendant, with very little effort on its own part, to place upon a plaintiff an unwarranted responsibility to substantiate each element of its case or face summary dismissal. Unwilling to countenance such a practice, we must reject the Firm's belated assertion that affirmance is appropriate in light of asserted inadequacies in Handeen's factual showing.

Ready to turn our attention to the substance of this appeal, we are left to ponder what legal standard should guide us in our task. There is authority for the proposition that a summary judgment motion should be denied whenever its proponent does not meet his initial burden, <u>see</u> <u>McKinney</u>, 765 F.2d at 1135, but we are reluctant to adopt this approach. Whatever the wisdom in submitting a motion that assumes the accuracy of a plaintiff's portrayal of the episode and does no more than question the sufficiency of the complaint, we see no reason to prevent a district court from granting summary judgment if the unchallenged facts cannot, as it turns out, sustain a viable cause of action. In these situations, we agree with our counterparts on the Fifth Circuit that the submission should be evaluated similarly to a 12(b)(6) motion to dismiss. <u>See</u> <u>Ashe</u>, 992 F.2d at 544. "Where a

motion for summary judgment is based solely on the pleadings and makes no [meaningful] reference to affidavits, depositions, or interrogatories, it makes no difference whether the motion is evaluated under Rule 56 or Rule 12(b)(6) because both standards reduce to the same question." Id. (quotation omitted). Therefore, a court should grant the motion and dismiss the action "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); see also WMX Techs., Inc. v. Gasconade County, Missouri, 105 F.3d 1195, 1198 (8th Cir. 1997)("In considering a motion to dismiss, the court must construe the complaint liberally and assume all factual allegations to be true."). Our review of the district court's decision is plenary. See WMX, 105 F.3d at 1198 (reviewing de novo district court's 12(b)(6) dismissal); Nangle v. Lauer (In re Lauer), 98 F.3d 378, 382 (8th Cir. 1996)(reviewing de novo district court's disposition of summary judgment motion).

### B.  18 U.S.C. § 1962(c)

A plaintiff who brings suit under 18 U.S.C. § 1962(c) must prove that the defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985); cf. United States v. Darden, 70 F.3d 1507, 1518 (8th Cir. 1995)(describing the elements in an alternative, but essentially equivalent, manner), cert. denied, 116 S. Ct. 1449, and cert. denied, 116 S. Ct. 2567 (1996).  "In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." Sedima, 473 U.S. at 496.  To determine whether Handeen has stated a substantive RICO violation, we must apply each of these elements

-12-

to the assertions within his Complaint.  Having done so, we are convinced that the district court committed error when it entered summary judgment for the Firm.

### 1. Conduct

Liability under § 1962(c) extends only to those persons associated with or employed by an enterprise who "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  In <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 185 (1993), the Supreme Court confirmed that this Circuit has correctly  interpreted the "conduct" requirement to authorize recovery only against individuals who "participate in the operation or management of the enterprise itself."  <u>See</u> <u>Bennett v. Berg</u>, 710 F.2d 1361, 1364 (8th Cir.)(en banc)(announcing the "operation or management" test), <u>cert. denied</u>, 464 U.S. 1008 (1983).  The Supreme Court clarified the scope of the operation or management test, observing:

> An enterprise is "operated" not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management.  An enterprise also might be "operated" or "managed" by others "associated with" the enterprise who exert control over it as, for example, by bribery.

> \*   \*   \*

> [Section] 1962(c) cannot be interpreted to reach complete "outsiders" because liability depends on showing that the defendants conducted or participated in the conduct of the "<u>enterprise's</u> affairs," not just their <u>own</u> affairs.  Of course, "outsiders" may be liable under § 1962(c) if they are "associated with" an enterprise and participate in the conduct of <u>its</u> affairs -- that is, participate in the operation  or management of  the enterprise  itself . . . .

-13-

<u>Reves</u>, 507 U.S. at 184-85 (emphasis in original)(footnote omitted). Consonant with the dictate of <u>Reves</u>, it is not necessary that a RICO defendant have wielded control over the enterprise, but the plaintiff "must prove some part in the <u>direction</u> . . . of the enterprise's affairs." <u>Darden</u>, 70 F.3d at 1543 (emphasis in original). <u>But cf.</u> <u>Department of Econ. Dev. v. Arthur Anderson & Co.</u>, 924 F. Supp. 449, 466-67 (S.D.N.Y. 1996)(suggesting that requirement of control is the hallmark of <u>Reves</u>).

The Supreme Court's approval and refinement of our operation or management test has had far-reaching implications, particularly in the area of professional liability under RICO. This is not especially surprising, given that <u>Reves</u> itself involved an attempt to impute liability to an accounting firm. There, the accounting firm certified that a co-op's records adequately reflected its financial status, and the firm relied upon those existing records, in combination with a review of past co-op transactions, to prepare audits for the organization. <u>Reves</u>, 507 U.S. at 173-75. In completing these assignments, and without informing the co-op's board, the firm utilized questionable measures to verify the co-op's solvency. <u>Id.</u> at 174-75. The Supreme Court affirmed our decision finding that the accounting firm's activity did not constitute conduct of a RICO enterprise. <u>Id.</u> at 186.

In our view, the <u>Reves</u> decision represents a fairly uncomplicated application of the operation or management test. This test, like <u>Reves</u> itself, is built upon a recognition that Congress did not mean for § 1962(c) to penalize all who are employed by or associated with a RICO enterprise, but only those who, by virtue of their association or employment, play a part in directing the enterprise's affairs. Furnishing a client with ordinary professional assistance, even when the client happens to be a RICO enterprise, will not normally rise to the level of

participation sufficient to satisfy the Supreme Court's pronouncements in <u>Reves</u>. In acknowledgment of this certainty, a growing number of courts, including our own, have held that an attorney or other professional does not conduct an enterprise's affairs through run-of-the-mill provision of professional services. <u>See</u> <u>Azrielli v. Cohen Law Offices</u>, 21 F.3d 512, 521 (2d Cir. 1994)(finding no RICO liability where defendant had "acted as no more than [an] attorney"); <u>Baumer v. Pachl</u>, 8 F.3d 1341, 1344 (9th Cir. 1993)(affirming dismissal of case against attorney whose "role was limited to providing legal services"); <u>University of Maryland v. Peat, Marwick, Main & Co.</u>, 996 F.2d 1534, 1538-40 (3d Cir. 1993)(holding that accounting firm could not be liable for performing generic financial services for an insurance company); <u>Nolte v. Pearson</u>, 994 F.2d 1311, 1317 (8th Cir. 1993)(deeming directed verdict appropriate where plaintiff's evidence did not indicate attorneys participated in the operation or management of the enterprise); <u>Menuskin v. Williams</u>, 940 F. Supp. 1199, 1210 (E.D. Tenn.)(granting summary judgment for attorney who performed "standard, routine" services for construction company), <u>appeal dismissed</u>, 98 F.3d 1342 (6th Cir. 1996). By the same token, RICO is not a surrogate for professional malpractice actions. <u>See</u> <u>University of Maryland</u>, 996 F.2d at 1539-40 (explaining that an accounting firm does not become liable under RICO by providing "materially deficient financial services"); <u>Baumer</u>, 8 F.3d at 1344 ("Whether [the attorney] rendered his services well or poorly, properly or improperly, is irrelevant to the <u>Reves</u> test.").

Appreciation for the unremarkable notion that the operation or management test does not reach persons who perform routine services for an enterprise should not, however, be mistaken for an absolute edict that an attorney who associates with an enterprise can never be liable under RICO. An attorney's license is not an invitation to engage in racketeering, and a lawyer no less than anyone else is

bound by generally applicable legislative enactments.  Neither <u>Reves</u> nor RICO itself exempts professionals, as a class, from the law's proscriptions, and the fact that a defendant has the good fortune to possess the title "attorney at law" is, standing alone, completely irrelevant to the analysis dictated by the Supreme Court.[12]  It is a good thing, we are sure, that we find it extremely difficult to fathom any scenario in which an attorney might expose himself to RICO liability by offering conventional advice to a client or performing ordinary legal tasks (that is, by acting like an attorney).  This result, however, is not compelled by the fact that the person happens to be a lawyer, but for the reason that these actions do not entail the operation or management of an enterprise.  Behavior prohibited by § 1962(c) will violate RICO regardless of the person to whom it may be attributed, and we will not shrink from finding an attorney liable when he crosses the line between traditional rendition of legal services and active participation in directing the enterprise.  The polestar is the activity in question, not the defendant's status.  <u>Cf.</u> <u>In re American Honda Motor Co. Dealerships Relations Litig.</u>, 941 F. Supp. 528, 560 (D. Md. 1996)("Th[e] cases reveal an underlying distinction between acting in an advisory professional capacity (even if in a knowingly fraudulent way) and acting as a direct participant in [an enterprise's] affairs.").

---

[12]The Court did reference the distinction between "outsiders" and "insiders" to a RICO enterprise, but only in response to an argument by amicus that the operation or management test exemplifies an overly crabbed reading of the Act which unnecessarily limits the liability of outsiders.  <u>Reves</u>, 507 U.S. at 184-85.  In addressing this concern, the Court stressed that outsiders who associate with an enterprise <u>will</u> be liable if they "participate in the operation or management of the enterprise itself."  <u>Id.</u> at 185.  To put it another way, outsiders, like all other people, will be liable only if their actions satisfy the operation or management test.

-16-

Bearing these principles in mind, we are confident that Handeen's Complaint could support a verdict against the Firm. At the outset, we think it worthwhile to reflect upon the nature of a Chapter 13 bankruptcy estate. Chapter 13 affords to a debtor with a regular source of income or earnings, and with a relatively small debt load, an opportunity to obtain a discharge of debts after devoting to creditors disposable income received over a period not to exceed five years. See In re Aberegg, 961 F.2d 1307, 1308 (7th Cir. 1992). Because creditors are paid from future earnings instead of assets, Chapter 13 permits a debtor who meets specified requirements to shield his property from seizure or liquidation. See McRoberts v. S.I.V.I. (In re Bequette), 184 B.R. 327, 333 (Bankr. S.D. Ill. 1995). Understandably, then, unless the repayment plan or bankruptcy court provides otherwise, the debtor retains custody of his possessions, see 11 U.S.C. § 1306(b) (1994), and "confirmation of a plan vests all of the property of the estate in the debtor," id. § 1327(b). Furthermore, the decision to seek Chapter 13 relief is wholly voluntary, and the debtor may, subject to exceptions not presently relevant, dismiss his case at any time. See id. § 1307(b). Finally, it is the debtor's exclusive prerogative to file a proposed repayment plan, see id. § 1321, and he enjoys many of the powers normally reserved to a bankruptcy trustee, see id. § 1303.

These examples illustrate, in pointed fashion, that the debtor exercises significant control over his Chapter 13 estate.[13] Of

---

[13]We certainly realize that a debtor is restrained by the authority of the bankruptcy court. This does not, however, alterthe reality that the debtor holds the power to create the estate and define its limits through the proposal of a repayment plan. Moreover, the continued existence of the Chapter 13 estate is, for the most part, subject to the debtor's whim. The court, in general, acts as a reactive party in the process by granting, or refusing to grant, approval to courses of action chosen by the

current paramountcy is how much of that control the debtor, in this case Lemaire, may have relinquished to others. If the Complaint is to be believed, as it must, the Firm might have been the beneficiary of considerable abdication. In keeping with the contentions in that pleading, Handeen's proof could show that the Firm and the Lemaires joined in a collaborative undertaking with the objective of releasing Gregory from the financial encumbrance visited upon him by Handeen's judgment. To realize that goal, Lemaire sought the assistance of the Firm. The attorneys, in turn, may have suggested that Chapter 13 bankruptcy, which presented a real opportunity for Lemaire to obtain a discharge of the debt arising from infliction of "willful and malicious injury by the debtor to another entity," 11 U.S.C. § 523(a)(6) (1994), offered the most propitious opportunity to reach the desired result. While Lemaire, obviously, was the party on whose behalf the Chapter 13 petition was filed, the Complaint could support a showing that the Firm navigated the estate through the bankruptcy system. Under this postulation, the Firm directed Gregory and his parents to enter into a false promissory note and create other sham debts to dilute the estate, the Firm represented the elder Lemaires and defended their fraudulent claims against objections, the Firm prepared Lemaire's filings and schedules containing erroneous information, the Firm formulated and promoted fraudulent repayment plans, and the Firm participated in devising a scheme to conceal

---

debtor. It is, without question, the debtor who stands at the helm of the Chapter 13 estate. Similarly, though a trustee is normally involved in the Chapter 13 process, "the trustee's functions are limited under Code § 1302 to administrative functions." Carr v. Demusis (In re Carr), 34 B.R. 653, 655 (Bankr. D. Conn. 1983), aff'd, 40 B.R. 1007 (D. Conn. 1984). "A Chapter 13 trustee, unlike a Chapter 7 trustee, serves a limited administrative function of ensuring that the debtor's plan meets the standards for confirmation, objecting to claims, and paying approved claims according to the confirmed plan." Bequette, 184 B.R. at 333.

-18-

Gregory's new job from the bankruptcy trustee.  In short, Handeen might prove that Lemaire, who was, after all, ultimately interested solely in ridding himself of the oppressive judgment, controlled his estate in name only and relied upon the Firm, with its legal acuity, to take the lead in making important decisions concerning the operation of the enterprise.

We underscore that we have no basis for speculating whether Handeen will, in the end, be able to substantiate this narrative.  We merely include the above hypothetical to show that relief is available "under a[] set of facts that could be proved consistent with the allegations." Hishon, 467 U.S. at 73.  If Handeen's evidence is up to this challenge, we are comfortable that he will have succeeded in proving that the attorneys conducted the bankruptcy estate.  In that event, this would not be a case where a lawyer merely extended advice on possible ways to manage an enterprise's affairs. Cf. Azrielli, 21 F.3d at 521 (foreclosing liability where defendant only acted as attorney in illicit transactions).  Nor would this be a situation where counsel issued an opinion based on facts provided by a client. See Reves, 507 U.S. at 185-86 (concluding that accounting firm did not violate RICO when it prepared audits in reliance upon a client's existing records); Nolte, 994 F.2d at 1316-17 (refusing to impose RICO liability where attorney had generated documents based on facts provided by client).  Instead, if the Firm truly did associate with the enterprise to the degree encompassed by the Complaint, we would not hesitate to hold that the attorneys "participated in the core activities that constituted the affairs of the [estate]," Napoli v. United States, 32 F.3d 31, 36 (2d. Cir. 1994), cert. denied, 115 S. Ct. 900, and reh'g granted, factual inaccuracies corrected, and original determination confirmed, 45 F.3d 680 (2d. Cir.), cert. denied, 115 S. Ct. 1796, and cert. denied, 115 S. Ct. 2015-16 (1995), namely, the manipulation of the bankruptcy process to

obtain a discharge for Lemaire.  In that instance, the Firm would have played some "role in the conception, creation, or execution," <u>Azrielli</u>, 21 F.3d at 521, of the illegal scheme, and we could safely say that the lawyers participated in the operation or management of the estate by assuming at least "<u>some</u> part in directing the enterprise's affairs." <u>Reves</u>, 507 U.S. at 179 (emphasis in original).  Therefore, we conclude that the Complaint could justify a finding that the Firm participated in the conduct of the alleged RICO enterprise.

### 2.  Enterprise

The Supreme Court has remarked that "[t]he 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages."  <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981).  Consequently, "[t]he existence of an enterprise at all times remains a separate element which must be proved by the [plaintiff]."  <u>Id.</u>  Faithful to these excerpts from <u>Turkette</u>, we have identified three  characteristics possessed by all RICO enterprises:  (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering.  See <u>Atlas Pile Driving Co. v. DiCon Fin. Co.</u>, 886 F.2d 986, 995 (8th Cir. 1989).  As set forth in the following paragraphs, we determine that the enterprise alleged in this case, the bankruptcy estate, bears these attributes.

### a.  Common or shared purpose

It seems to us manifest that the common or shared purpose of a bankruptcy estate is to collect assets and pay off creditors.  The Firm, though, asserts that this prerequisite is unmet because

the attorneys did not stand to benefit economically from the enterprise.[14] This contention is specious. Our cases have established that the enterprise _itself_, broadly speaking, must be marked by a common purpose, but it is not necessary that every single person who associates with the entity gain some discrete advantage as a result of that particular motivation. Prospective benefit to an individual collaborator is simply impertinent; it is sufficient if a RICO defendant shared in the _general_ purpose and to some extent facilitated its commission. See _United States v. Kragness_, 830 F.2d 842, 856 (8th Cir. 1987)(deeming this factor satisfied where each defendant shared common purpose and to some extent carried it out); _United States v. Lemm_, 680 F.2d 1193, 1199 (8th Cir. 1982)("Each appellant shared with Eugene Gamst the purpose of setting arson fires so as to defraud one or more insurance companies, and each carried out this purpose to some extent."), _cert. denied_, 459 U.S. 1110 (1983). The overall mission of Lemaire's bankruptcy estate was to obtain a discharge of his debts in accord with the terms of a repayment plan, and the Firm knowingly made positive contributions toward that goal. Thus, we easily decide that the common purpose element is present here.

**b. Continuity of structure and personnel**

---

[14]The Firm cites _United States v. Flynn_, 852 F.2d 1045, 1052 (8th Cir.), _cert. denied_, 488 U.S. 974 (1988), in support of its argument that a RICO enterprise "must be directed toward an economic goal." The United States Supreme Court quoted that very passage from _Flynn_ when it reached exactly the opposite conclusion in _National Org. for Women, Inc. v. Scheidler_, 510 U.S. 249, 257 (1994)("Nowhere in either § 1962(c) or the RICO definitions in § 1961 is there any indication that an economic motive is required."). We remind litigants that they are expected to thoroughly research all issues included within briefs before this Court.

In <u>Kragness</u>, we elaborated on this component of a RICO enterprise:

> Continuity of structure exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than an ad hoc, basis. The continuity-of-personnel element involves a closely related inquiry, in which the determinative factor is whether the associational ties of those charged with a RICO violation amount to an organizational pattern or system of authority. The continuity of these elements need not be absolute . . . . [B]oth the structure and the personnel of an enterprise may undergo alteration without loss of the enterprise's identity as an enterprise.

<u>Kragness</u>, 830 F.2d at 856 (citations, quotation, and alteration omitted). We resolve that the Complaint could support a conclusion that Lemaire's bankruptcy estate exhibited the requisite continuity of structure and personnel.

We have already commented that the Complaint embraces an intricate and organized scheme. The players, who remained constant throughout the endeavor, devised a detailed plan to defraud Handeen. Lemaire, the primary beneficiary, was required to file a bankruptcy petition, make various court appearances, lend his signature to documents, and comply with the repayment plan. The parents, who made false claims in order to deplete estate assets and syphoned money back to Gregory, assumed the role of fictitious creditors. The Firm directed the affair, representing Lemaire and his parents, and took primary responsibility for shepherding the estate through our often labyrinthine legal system.

Comparing these allegations to the guidelines announced in <u>Kragness</u> is a fairly straightforward undertaking. Under the facts as we must construe them, it is not challenging to discern a

continuity of structure.  If Handeen is correct in his depiction, the bankruptcy estate, perhaps captained by the Firm, was assuredly betokened by a "system of authority that provide[d] a mechanism for directing the group's affairs on a continuing . . . basis."  Kragness, 830 F.2d at 856. Moving to the personnel question, we believe the relationships between the several actors suffice to demonstrate a sophisticated organizational pattern.[15]  Put simply, the sort of association described in the Complaint, if proven at trial, would adequately show that the estate possessed continuity of structure and personnel.

### c.  Ascertainable structure

In assessing whether an alleged enterprise has an ascertainable structure distinct from that inherent in a pattern of racketeering, it is our normal practice to determine if the enterprise would still exist were the predicate acts removed from the equation.  "Separating the enterprise from the pattern of racketeering is generally not problematic where a legal entity is involved, since this entity is likely to be clearly distinct from the acts of racketeering."  Kragness, 830 F.2d at 855 n.10 (quotation omitted).  It should come as no surprise, then, that we ascertain the bankruptcy estate, a legal entity, would have endured even if the slate were wiped clean of the underlying racketeering activity.  Absent the fraudulent filings,[16] the fictitious claims,

---

[15]It appears to us fundamental that the continuity of personnel element will be satisfied where continuity of structure has been established and where, as here, the membership of an enterprise does not change.

[16]It might be argued that the enterprise would have collapsed without the fraudulent submissions because failure to file those documents would have resulted in dismissal of Lemaire's petition.  In removing the predicate acts from our analysis, however, we assume that the filings would have been made, but with accurate contents.  Otherwise, it would be unduly difficult to find an enterprise in situations similar to this.

and the mail fraud scheme, the estate would have persevered as a valid attempt to give Lemaire an economic "fresh start." The estate would still have continued as a vehicle for obtaining a legitimate discharge of debts through the payment of creditors.[17] Cf. Atlas, 886 F.2d at 996 (detecting distinct entity where, after putting aside predicate acts, enterprise still exhibited on-going structure by selling real estate, loaning money, and building houses); Kragness, 830 F.2d at 857-58 (involving enterprise that purchased property, acquired airplanes, and rented buildings). But cf. Stephens, Inc. v. Gelderman, Inc., 962 F.2d 808, 816 (8th Cir. 1992)(failing to find separate enterprise where, absent predicate acts, the association had "no form or structure."). The enterprise had an ongoing structure independent from the predicate acts of racketeering, and there is little chance that the estate might have impermissibly been equated with those nefarious deeds. See Lemm, 680 F.2d at 1201 (finding ascertainable structure where the enterprise had not been equated with the predicate acts of racketeering).

In sum, we conclude that Handeen might prove, consistent with his Complaint, that the bankruptcy estate possessed those

---

[17]This Court has previously held that a Chapter 13 bankruptcy estate survives confirmation of the debtor's repayment plan. See Security Bank v. Neiman, 1 F.3d 687, 690 (8th Cir. 1993).

characteristics common to RICO enterprises.[18]  Having thus decided, we now proceed to the lingering issues in this appeal.

### 3.  Pattern

It is by now familiar doctrine that a pattern of racketeering activity is present only when predicate acts are linked by "continuity plus relationship."  H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989)(emphasis omitted).  Prohibited activities are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  Id. at 240 (quotation omitted).  Continuity is more of an abstraction, but the Court has referred to it as "both a closed- and open-ended concept," id. at 241, which is principally temporal in nature.  "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time."  Id. at 242.  Failure to shoulder this burden is not an insuperable bar to relief, however, because even if the acts do not span the years necessary to establish closed-ended continuity, see Primary Care Investors, Seven, Inc. v. PHP Healthcare Corp., 986 F.2d 1208, 1215 (8th Cir. 1993)("Other Circuits have consistently held that the requirement of continuity over a closed period is not met when the predicate acts extend less than a year."), the predicates will meet the definition of open-ended continuity to the extent they

---

[18]In reaching this result, we take comfort in cases which indicate that a probate estate can act as a RICO enterprise.  See, e.g., Gunther v. Dinger, 547 F. Supp. 25, 27 (S.D.N.Y. 1982)(concluding that a probate estate can be a RICO enterprise).  By our estimation, there is little difference, as far as the federal racketeering statute is concerned, between a probate estate and a bankruptcy estate.

-25-

"involve a distinct <u>threat</u> of long-term racketeering activity," <u>H.J.</u>, 492 U.S. at 242 (emphasis added). "The determination of a pattern of racketeering activity is a factual determination." <u>Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank</u>, 934 F.2d 976, 980 (8th Cir. 1991).

The predicate acts relied upon by Handeen were related, as they had the same purposes, results, participants, and victim. Additionally, the racketeering activity described in the Complaint, which began in January 1987 and concluded with monthly acts of asserted mail fraud that persisted through early 1990, was pervasive and is more than sufficient to demonstrate closed-ended continuity.[19] <u>See Diamonds Plus, Inc. v. Kolber</u>, 960 F.2d 765, 769 (8th Cir. 1992)(identifying as adequate multiple acts committed over two year span); <u>Atlas</u>, 886 F.2d at 994 (finding continuity where conduct occurred over a period of more than three years). Because the predicate acts allegedly committed by the attorneys exhibited both relatedness and continuity, we must reject the Firm's argument that Handeen has failed to show a pattern of racketeering activity.

### 4. Racketeering Activity

In challenging Handeen's assertion that the Firm engaged in "racketeering activity" as that term has been defined by Congress,

---

[19]The Firm places much stock in <u>Lambert</u>, 934 F.2d at 981, where we adjudged that "a single transaction which involves only one victim and takes place over a short period of time does not constitute the pattern of racketeering required for long-term criminal activity under a RICO claim." We still adhere to this statement, but we cannot classify the racketeering activity recounted by Handeen as "a single transaction." Moreover, we do not believe a period exceeding three years represents "a short period of time."

<u>see</u> 18 U.S.C. § 1961(1) (1994) (listing as predicate acts certain state law crimes, conduct that is "indictable" under various federal provisions, and numerous other "offenses"), the Firm essentially relies on an averment that the lawyers are not guilty of any "actionable behavior." This exemplifies a fallacy in reasoning commonly known as "begging the question." For example, the Firm posits that the attorneys could not have committed a crime by instructing the elder Lemaires to press a claim against the estate because "Gregory Lemaire believed . . . that the sums represented by the promissory note were justly due and owing to his parents" and "[r]elatives are permitted to assert claims in a bankruptcy proceeding." This is all good and well, but these bald assertions, unsupported by affidavit or deposition testimony, do not even begin to explain why Handeen's Complaint, which expressly maintains the Lemaires' claims were fraudulent, does not state a predicate act. Similarly, the Firm denies it had any "obligation" to notify the Chapter 13 trustee of Gregory's change of address and employment, but this is absolutely irrelevant to Handeen's assertion that the lawyers' involvement in Lemaire's concealment amounted to mail fraud or some other crime.[20]

Put succinctly, the Firm has not listed the elements of the various offenses and ventured to demonstrate why Handeen's proof is lacking. Instead, the lawyers have proffered conclusory denials. This is an insufficient showing on behalf of a litigant who seeks summary judgment. It is an elementary precept of civil procedure that "[t]he party moving for summary judgment cannot sustain his

---

[20]We note that the Firm does not contest Handeen's representations under Rule 9(b) of the Federal Rules of Civil Procedure. <u>Cf.</u> <u>Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.</u>, 48 F.3d 1066, 1069 (8th Cir. 1995)("The particularity requirements of Rule 9(b) apply to allegations of mail fraud . . . and wire fraud . . . when used as predicate acts for a RICO claim.").

burden merely by denying the allegations in the opponent's pleadings." 10A Charles A. Wright et al., Federal Practice and Procedure § 2727, at 131 (2d ed. 1983). Importantly, "a party moving for summary judgment is not entitled to a judgment merely because the facts he offers appear more plausible than those tendered in opposition, or because it appears that the adversary is unlikely to prevail at trial." Id. § 2725, at 104-05. Handeen's Complaint is not so facially deficient that we could justifiably say he will be unable to corroborate his allegations that the Firm committed designated predicate acts contained in 18 U.S.C. § 1961(1). As a consequence, the Firm is not entitled to summary judgment.

### 5. Injury

The Firm next argues that Handeen has no standing to prosecute this action because he has not suffered an injury to his business or property attributable to a RICO violation. See Sedima, 473 U.S. at 496 ("[T]he plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."). We disagree. Handeen poses many diverse theories to expose how he was injured by the RICO enterprise. As an example, he cites the attorneys' fees he incurred in objecting to the Lemaires' supposedly fraudulent claims.[21] We think that this asserted liability, if proven at trial, qualifies as an injury to business or property that was proximately caused by a predicate act of racketeering. See Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268

---

[21]Here, the Firm does advert to the record in an attempt to establish that Handeen has not adequately demonstrated his claimed attorneys' fees. We hold, however, that the documents submitted by Handeen are sufficient to raise a genuine issue of material fact on this point.

(1992)(deciding that RICO violation must be proximate cause of injury to business or property); Bowman v. Western Auto Supply Co., 985 F.2d 383, 385-86 (8th Cir.)(explaining that a § 1962(c) plaintiff must allege injury traceable to a predicate act of racketeering), cert. denied, 508 U.S. 957 (1993).  Because this ground for recovery is, in itself, sufficient to convey standing, we need not consider the soundness of the other alternatives advanced by Handeen.

### C.  18 U.S.C. § 1962(d)

Handeen also charges that the Firm violated 18 U.S.C. § 1962(d) through participation in a RICO conspiracy.  When a plaintiff has already established a right to relief under § 1962(c), he may show a conspiracy to violate RICO simply by presenting additional evidence that the defendant entered into an agreement to breach the statute.  See United States v. Bennett, 44 F.3d 1364, 1374 (8th Cir.), cert. denied, 115 S. Ct. 2279, and cert. denied, 115 S. Ct. 2585, and cert. denied, 116 S. Ct. 98 (1995).  In the context of this case, it is momentous that a plaintiff "need only establish a tacit understanding between the parties, and this may be shown wholly through the circumstantial evidence of [each defendant's] actions." Darden, 70 F.3d at 1518 (8th Cir. 1995)(quotation omitted).  On the force of these authorities, we believe that Handeen's Complaint, broadly construed, provides an ample foundation to sustain a finding that the Firm "objectively manifested an agreement to participate directly, or indirectly, in the affairs of [the] enterprise through the commission of two or more predicate crimes."  Bennett, 44 F.3d at 1372 (quotation omitted).

### D.  The State Law Claim

Handeen also attempts to hold the Firm liable under state law, and to buttress this endeavor he alludes in his Complaint to two Minnesota statutes. See Minn. Stat. Ann. §§ 481.07-.071 (West 1990). The district court granted summary judgment on this aspect of the case because it reasoned that the enactments in question merely authorize treble damages in certain civil suits and do not create independent grounds for relief. See Gilchrist v. Perl, 387 N.W.2d 412, 419 (Minn. 1986)(stating that the two provisions are "virtually identical"); Love v. Anderson, 61 N.W.2d 419, 422 (Minn. 1953)("[Minn. Stat. Ann. § 481.07] deals with penalties for deceit or collusion. It does not create a new cause of action. The common law gives the right of action and the statute the penalty."). We think the district court correctly appraised the legal effect of these statutes, but in light of the peculiar stance in which this action presents itself, we cannot agree that summary judgment was appropriate. We note, in particular, that this claim expressly incorporates all of the allegations relevant to the RICO charge, and Handeen unequivocally asserts that the Firm acted to "deceive a party to a court proceeding and deceive the court." Mindful of the liberal construction we are required at this stage of the proceedings to afford the Complaint, we ascertain that Handeen's pleading sufficiently conveys that he intends to prove the Firm committed "deceit" in violation of the common law. Giving Handeen the benefit of the doubt, we accept his explanation that he invoked Minn. Stat. Ann. §§ 481.07-.071 for damages purposes only. Nevertheless, because the district court dismissed this portion of the Complaint on purely procedural grounds, we think it would be advisable for that court, with its greater familiarity with local law, to determine on remand whether Handeen's contentions could constitute "deceit or collusion" pursuant to the common law of Minnesota.

## III. CONCLUSION

For reasons expressed in the preceding pages, we reverse the district court's order to the extent it grants the Firm's motion for summary judgment on Handeen's state law and RICO claims.  We affirm the district court's order in all other respects and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

A true copy.


Attest:



CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.