WEBSTER INDUSTRIES, INC., a Minnesota Corporation; Kretz Lumber Co., Inc., a Wisconsin Corporation; Woodline Manufacturing, Inc., a Minnesota Corporation; Wycombe Wood Products, Inc., a Wisconsin Corporation; and Hart Tie & Lumber, Inc.,a Wisconsin Corporation, Plaintiffs,

v.

NORTHWOOD DOORS, INC., an Iowa Corporation; Partridge River Superior, Inc., a Wisconsin Corporation; Partridge River, Inc., a Minnesota Corporation; Partridge River Holdings, Inc., a Minnesota Corporation; Superior Dimension and Doors, L.L.C., a Minnesota Limited Liability Company; China Hardwood Import Products, L.L.C., a Minnesota Limited Liability Company; Andrew Richey; and Michael Miner, Defendants.

No. C 02–3068–MWB.

United States District Court,
N.D. Iowa,
Central Division.

March 25, 2004.

Jeffery S Haff, Jeffrey S. Haff & Associates, PA, Minneapolis, MN, for Hart Tie & Lumber Co., Inc, Kretzlumber Co Inc, Webster Industries Inc, Woodline Manufacturing, Inc, Wycombe Wood Products, Inc, Plaintiffs.

Donna Renae Miller, Grefe & Sidney, Des Moines, IA, for Michael Miner, Northwood Doors, Inc, China Hardwood Imports, Inc, Partridge River Holdings, Inc, Superior Door and Dimension, Inc, Partridge River, Inc, Partridge River Superior, Inc, Defendants.

Ryan Patrick Tang, Law Office of Ryan P. Tang, PC, Cedar Rapids, IA, for Hart Tie & Lumber Co., Inc, Kretzlumber Co Inc, Webster Industries Inc, Woodline Manufacturing, Inc, Wycombe Wood Products, Inc, Plaintiffs.

John Werner, Grefe & Sidney, Des Moines, IA, for Michael Miner, Northwood Doors, Inc, Partridge River, Inc, China Hardwood Imports, Inc, Partridge River Holdings, Inc, Partridge River Superior, Inc, Superior Door and Dimension, Inc, Defendants.

**MEMORANDUM OPINION AND ORDER REGARDING THE PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST NORTHWOOD DOORS, AND THE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS VI–X AND XVI–XL**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* ..................................................... 825
  A. *Procedural Background* ......................................... 825
  B. *Factual Background* ............................................ 826

II. *LEGAL ANALYSIS* .................................................. 828
  A. *Standards For Summary Judgment* ............................... 828
  B. *The Vendors' Motion For Partial Summary Judgment* ............. 829
  C. *The Defendants' Motion For Partial Summary Judgment* .......... 830
    1. *Choice of law* .............................................. 831
    2. *The "Quantum Valebant" claims* .............................. 832
      a. *Arguments of the parties* ................................ 832
      b. *Analysis* ................................................ 832
    3. *The "Fraudulent Transfer" claims* .......................... 834
      a. *Arguments of the parties* ................................ 834
      b. *Analysis* ................................................ 835
        i. *Applicable law* ........................................ 835
        ii. *Richey's personal guarantee* .......................... 837
        iii. *Northwood's property* ................................ 837
    4. *The "Unjust Enrichment" claims* ............................ 839
      a. *Arguments of the parties* ................................ 839
      b. *Analysis* ................................................ 840
    5. *The "Corporate Opportunities and Duties" claims* ........... 841
    6. *The "Fraud" claims* ........................................ 842
      a. *Arguments of the parties* ................................ 842
      b. *Analysis* ................................................ 843
        i. *Nature of the claims* .................................. 843
        ii. *Elements of the claims* .............................. 844
    7. *The "RICO" claims* ......................................... 846
      a. *Arguments of the parties* ................................ 846
      b. *Analysis* ................................................ 847
        i. *Elements of the RICO claims* .......................... 847
        ii. *Pleading requirements for the RICO claims* ........... 847
        iii. *Supporting evidence* ................................ 849

III. *CONCLUSION* .................................................... 851

Perhaps fraud, like beauty, is in the eye of the beholder. In this action, where the plaintiffs see a grand conspiracy among

allegedly related businesses to defraud suppliers, the defendants see appropriate actions by a secured creditor to wind up a business unexpectedly rendered insolvent by the sudden defection of its primary customer. Unlike art critics and beauty pageant judges, who may make a subjective determination of "beauty," this court's task on motions for partial summary judgment on the plaintiffs' claims is not to determine whether there has been "fraud" or any other wrong-doing. Instead, this court must determine only whether the resisting parties have generated genuine issues of material fact that warrant submitting their view of the case to a jury.

## I. INTRODUCTION

### A. Procedural Background

On June 13, 2002, the various plaintiffs captioned above, described collectively herein as "the Vendors," filed a "Petition at Law" in the Iowa District Court for Worth County asserting numerous claims arising from the failure of insolvent defendant Northwood Doors, Inc., to pay for goods and services that it received from the Vendors. More specifically, Webster Industries, Inc., seeks $177,230.88; Kretz Lumber Company, Inc., seeks $76,539.03; Woodline Manufacturing, Inc., seeks $99,154.91; Wycombe Wood Products, Inc., seeks $62,575.70; and Hart Tie & Lumber Company, Inc., seeks $83,708.57. Each Vendor also seeks pre- and post-petition interest on the sum alleged. The defendants named in the petition include two individuals and several corporations in addition to Northwood. The additional corporate defendants are Partridge River Superior, Inc., Partridge River, Inc., and Partridge River Holdings, Inc., all three of which are described collectively herein as the "Partridge Defendants," Superior Dimension and Doors, L.L.C. (SDD), and China Hardwood Import Products, L.L.C. (CHIPS). The individual defendants are

Andrew Richey and Michael Miner, who allegedly are or were responsible for the day-to-day operations of the defendant companies. Although the Vendors only provided goods to Northwood, they allege that, at all pertinent times, there existed a unity of interest and ownership among the various defendants, such that the individuality or separateness of each corporation or individual should be disregarded. Failure to pierce the corporate veil in this way, they allege, would sanction a fraud, promote injustice, or both.

The specific claims asserted by the Vendors at the outset of this litigation were the following: (1) Counts I through V of the petition alleged "Actions on Account"; (2) Counts VI through X alleged claims denominated "Quantum Meruit," but these claims were later recharacterized by the Vendors as "Quantum Valebant"; (3) Counts XI through XV alleged actions on "Accounts Stated"; (4) Counts XVI through XX alleged "Fraudulent Transfers"; (5) Counts XXI through XXV alleged "Unjust Enrichment"; (6) Counts XXVI through XXX alleged "Misappropriation of Corporate Opportunity/Breach of Fiduciary Duty/Breach of Duty of Good Faith and Fair Dealing"; (7) Counts XXXI through XXXV alleged "Fraud"; and finally (8) Counts XXXVI through XL alleged claims pursuant to the "Racketeer Influenced and Corrupt Organization Act (RICO)." *See Webster Indus., Inc. v. Northwood Doors, Inc.*, 234 F.Supp.2d 981, 984–86 (N.D.Iowa 2002) (*Webster Industries I* ) (identifying the Vendors' claims in somewhat greater detail). Defendant Miner removed this action to this federal court on September 9, 2002, citing the Vendors' RICO claims as the basis for federal question jurisdiction. The Vendors did not challenge the removal. Although the Vendors were granted leave to amend their removed complaint on October 15, 2002, that amendment went to the proper identi-

fication of one of the defendants rather than to the addition, deletion, or modification of any claims.

Defendant Miner, joined by defendant Northwood, made a pre-answer challenge to some of the claims in the Vendors' removed petition. By order dated November 14, 2002, the court denied Miner's and Northwood's motion to dismiss as to Counts VI through X ("Quantum Meruit," recharacterized as "Quantum Valebant"), but granted the motion as to Counts XXVI through XXX ("Misappropriation of Corporate Opportunity/Breach of Fiduciary Duty/Breach of Duty of Good Faith and Fair Dealing"). *See id.* at 998. Therefore, Counts I through XXV and XXXI through XL are still pending as to all defendants except Richey, and Counts XXVI through XXX are still pending against all defendants except Northwood, Miner, and Richey.

In a subsequent ruling, on February 13, 2003, the court denied the Vendors' motion for default judgment against the Partridge Defendants, SDD, CHIPS, and Andrew Richey, and granted the motion by these defendants to set aside the entry of default against them by the Clerk of Court, on the ground that these defendants had never been properly served. *See Webster Indus., Inc. v. Northwood Doors, Inc.,* 244 F.Supp.2d. 998 (N.D.Iowa 2003) (*Webster Industries II*). All of the defendants, with the exception of Andrew Richey, were subsequently properly served and eventually appeared and defended in this action.

Trial is scheduled to begin in this matter on April 19, 2004. However, now before the court are two motions for partial summary judgment aimed at eliminating trial on most of the Vendors' claims. The first is the Vendors' December 9, 2003, motion for partial summary judgment against

Northwood on claims identified by the Vendors as their "contract and unjust enrichment claims." *See* Plaintiffs' Motion For Partial Summary Judgment Against Northwood Doors, Inc. (docket no. 58) at 1. Notwithstanding the Vendors' failure to identify the precise counts in question, Northwood, the Partridge Defendants, SDD, CHIPS, and Michael Miner reported to the court on February 2, 2004, that they have no resistance to the Vendors' motion for partial summary judgment. Unlike the first motion for partial summary judgment, the second motion for partial summary judgment now before the court is resisted. That motion is the defendants' December 12, 2003, motion for partial summary judgment (docket no. 59) on Counts VI through X and XVI through XL of the Vendors' complaint. The Vendors resisted that motion on January 9, 2004, and the defendants filed a reply in further support of the motion on February 2, 2004.[1] Even if granted, these motions for partial summary judgment will leave for trial the claims in Counts I through V ("Actions On Account") and XI through XV ("Accounts Stated") against all defendants except Northwood, which does not resist summary judgment on these counts, and Andrew Richey, who has never been served with the complaint.

The parties have not requested oral arguments on the pending motions for partial summary judgment and the court has not found it necessary to order such oral arguments *sua sponte.* Therefore, the motions for partial summary judgment are now fully submitted on the record and written arguments.

### B. Factual Background

Rather than attempt an exhaustive survey of the facts, undisputed and disputed,

---

1. The defendants filed a corrected response to the Vendors' statement of additional facts on February 5, 2004.

in this case, the court will provide here sufficient factual background to the parties' dispute to put in context their arguments concerning the pending motions for partial summary judgment. Additional facts, or factual disputes, will be discussed as they become relevant in the court's legal analysis.

Northwood and the Partridge Defendants were at least nominally separate corporations, with common owners—including Michael Miner, Andrew Richey, and their families—and overlapping, but not identical, boards of directors. Although the defendants dispute the Vendors' contention that Northwood and the Partridge Defendants were operated as "one entity," there is undisputed evidence of interrelationship of the operations of these nominally separate entities. For example, the defendants do not dispute the following: (1) that there were "inter-company transfers" of assets for "credits on the books," but without cash changing hands; (2) that individual companies in the group used credit references actually based on business relationships of other companies in the group; (3) that when the entities borrowed money from the bank, all of the entities signed "jointly and severally," rather than in proportion to the benefit to any individual corporation; or (4) that Miner's, Inc., a separate entity wholly owned by the Miner family, guaranteed the debts of Northwood and the Partridge Defendants—indeed, the defendants affirmatively state that Miner's, Inc., "funded these companies."

The Vendors all shipped goods to Northwood (and only Northwood) in the summer and fall of 2001. Northwood then used or intended to use those goods in its manufacturing business. The last goods supplied by the Vendors were shipped prior to October 24, 2001. That date is significant, because on October 24, 2001, Northwood received notice from Medallion Cabinetry, Northwood's primary customer, that Me-

dallion was terminating the business relationship between the two companies in less than a week. After receiving the notice from Medallion, Andrew Richey, the president of Northwood, made the decision to close the Northwood plant in Northwood, Iowa. Northwood returned some of the goods supplied by the Vendors, but the Vendors refused to accept return of goods that had been custom made for Northwood. The defendants assert that only after the Vendors had refused to accept some returns were remaining raw materials transferred from Northwood to Partridge River Superior, but the Vendors contend that there is no evidence of when those transfers occurred, although there is no dispute that the transfers did occur at some point. Although the defendants maintain that Richey continued to attempt to work out payment arrangements with the Vendors, the Vendors point out that they were never paid for the goods in question.

The defendants contend that Richey believed that Northwood could continue operations and pay all of its creditors until Medallion Cabinetry withdrew its business. The Vendors, however, contend that Northwood was in financial difficulties before Medallion Cabinetry notified Northwood that it was terminating their relationship. The Vendors point to evidence, including e-mails, that Andrew Richey had considered closing Northwood on or about October 1, 2001, but that the corporate decision-makers had decided to continue operations in what Richey himself described at the time as a "180–degree turn." The Vendors also point to other evidence that employees of Northwood and the Partridge Defendants were concerned about "misleading vendors" or getting behind with vendors before October 2001. The Vendors contend that Northwood representatives nevertheless encouraged them to ship products to Northwood knowing

that Northwood would never pay for those products, while at the same time "stripping assets" from Northwood by transferring equipment to the Partridge Defendants.

The parties do not dispute that, from October 27, 2000, until April 15, 2002, M & I Bank was the first-priority secured creditor of Northwood, as well as the other Partridge Defendants. M & I's enforceable security interest was in all of Northwood's and the Partridge Defendants' "equipment, fixtures, inventory ..., documents relating to inventory, general intangibles, accounts, deposits, contract rights, chattel paper and instruments, investment property, and all additions and accessories to, all spare and repair parts, special tools, equipment," and included a mortgage on the real property of the Northwood plant. Furthermore, the parties do not dispute that on April 15, 2000, Miner's, Inc., purchased all of the M & I loan documents from M & I and entered into other financial arrangements to succeed to the interests of M & I Bank, after which Miner's, Inc., had stepped into M & I's position as the first-priority secured creditor of Northwood and the Partridge Defendants. Similarly, the parties do not dispute that, from December 21, 1999, through May 6, 2002, Wells Fargo Equipment Finance, Inc., had a secured interest in the equipment at the Northwood plant, but that Miner's, Inc., entered into an Assignment and Assumption Agreement with Wells Fargo on May 6, 2002, whereby Miner's, Inc., acquired all of Wells Fargo's right, title, and interest under the Northwood loan documents and security instruments. It is undisputed that the amounts of the liens and security interests secured by the assets of Northwood and the Partridge Defendants exceeded the value of those assets. However, the Vendors contend that the liens and security interests secured by *Northwood's* assets did not necessarily exceed the value of that company's assets.

The defendants contend that all of the products shipped by the Vendors were subject to security interests of Northwood's creditors and that the Vendors had notice of those security interests through proper filing and recording of the liens. They also contend that all of the transfers by Miner's, Inc., of Northwood's assets after Miner's, Inc., succeeded to M & I's and Wells Fargo's security interests, were within the rights of a secured party. Those transfers included transferring Northwood's assets to SDD, a separate entity wholly owned by the Miner family, for credit against Northwood's debts, after Northwood ceased operations; foreclosing on the mortgage on Northwood's real property; purchasing that property at a sheriff's sale; and reselling that property and equipment on the property for an amount in excess of what Miner's, Inc., bid for the real property in the sheriff's sale.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

The disposition of a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ordinarily depends upon whether or not there are genuine issues of material fact for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996) (on a motion for summary judgment, the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). In reviewing the record, the court must view all of the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Quick,* 90

F.3d at 1377 (same). Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir.1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston v. NME Hosps., Inc.,* 133 F.3d 1104, 1107 (8th Cir.1998); *Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). When the moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel,* 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co.,* 475 U.S. at 586–87, 106 S.Ct. 1348). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.,* are "material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). The court will apply these standards to the pending motions for partial summary judgment.

## B. The Vendors' Motion For Partial Summary Judgment

The first motion for partial summary judgment now before the court is the Vendors' December 9, 2003, motion for partial summary judgment (docket no. 58). In that motion, the Vendors seek summary judgment against Northwood on what the Vendors now describe as their "contract and unjust enrichment claims." *See* Plaintiffs' Motion For Partial Summary Judgment Against Northwood Doors, Inc. (docket no. 58) at 1. The Vendors acknowledge that partial summary judgment in their favor on these claims against Northwood "may be a meaningless gesture," because Northwood is "now assetless." *See* Plaintiffs' Brief In Support Of Motion For Partial Summary Judgment Against Northwood Doors, Inc., at 3. Nevertheless, the Vendors contend that there is no genuine issue of material fact that they were not paid for products that they supplied to Northwood and that they are, therefore, entitled to judgment as a matter of law in the amount due and owing to each of them from Northwood. As mentioned above, notwithstanding the Vendors' failure to identify the precise counts in question, Northwood, the Partridge Defendants, SDD, CHIPS, and Michael Miner reported to the court on February 2, 2004, that they have no resistance to the Vendors' motion for partial summary judgment. *See* Defendants' Report To Court Regarding Response To Plaintiffs' [First] Motion For Summary Judgment (docket no. 67). The defendants' "Report" was in keeping with Rule 56.1 of the Local Rules Of The United States District Courts For The Northern District Of Iowa, which encourages a party who does not intend to resist a motion for summary judgment to file a state-

ment indicating that the motion will not be resisted. Because the Vendors' first motion for partial summary judgment is not resisted, the Vendors are entitled to the judgment they seek. Nevertheless, there are still one or two matters for the court to resolve regarding this motion for partial summary judgment.

First, the court must resolve the question of the specific claims to which the motion refers. What the Vendors mean by their "unjust enrichment claims" is clear enough, because Counts XXI through XXV are specifically identified in the amended complaint as "Unjust Enrichment" claims. The court assumes that what the Vendors mean by their "contract claims" is claims based on "implied-in-fact" contract theories, that is, the claims in Counts I through XV, identified in the complaint as "Actions on Account," "Quantum Meruit" (later recharacterized as "Quantum Valebant"), and "Accounts Stated." *See Webster Industries II*, 234 F.Supp.2d at 987 (noting that the Vendors argued, in response to the defendants' motion to dismiss, that they had not asserted any "express contract" claims) & 991–94 (distinguishing between *pleading* "quantum meruit" or other implied-in-fact contract theories and "express contract" theories *in the alternative*, which is allowed, and *recovering* on both "implied-in-fact" and "express" contract theories, which is not). Therefore, the court will grant the Vendors' motion for partial summary judgment in their favor against Northwood Doors on Counts I through XV and XXI through XXV.

Second, the court must consider the amount that the Vendors are entitled to recover on these claims. The Vendors now pray for the following amounts: Webster Industries for $253,352.05; Kretz Lumber for $78,434.34 plus statutory interest after January 2, 2002; Woodline Manufacturing for $99,154.91 plus late fees

at the rate of 24% per annum from and after October 16, 2001; Wycombe Wood Products for $68,667.64; and Hart Tie & Lumber Company for $118,866.16. Although these sums differ from the amounts allegedly due at the time that the Vendors' filed their complaint, the Vendors also expressly prayed in their complaint for pre- and post-petition interest at specified rates. The court concludes—not least because the defendants make no resistance—that the Vendors have properly calculated their recovery in light of applicable pre- and post-petition interest rates. Finally, it does not appear that the Vendors are improperly seeking multiple recoveries on multiple theories, where they each seek only one sum as their recovery under four different theories. Therefore, the court will enter partial summary judgment in the amounts for which the Vendors pray.

### C. The Defendants' Motion For Partial Summary Judgment

The second motion for partial summary judgment now before the court is the defendants' December 12, 2003, motion for partial summary judgment (docket no. 59) on Counts VI through X and XVI through XL of the Vendors' complaint. Somewhat more specifically, this motion challenges the Vendors' claims on theories of "Quantum Meruit," recharacterized as "Quantum Valebant" (Counts VI through X); "Fraudulent Transfer" (Counts XVI through XX); "Unjust Enrichment" (Counts XXI through XXV); "Misappropriation of Corporate Opportunity/Breach of Fiduciary Duty/Breach of Duty of Good Faith and Fair Dealing" (Counts XXVI through XXX); "Fraud" (Counts XXXI through XXXV); and "RICO Violation" (Counts XXXVI through XL). Presumably, the motion seeks partial summary judgment in favor of all of the defendants to the extent that such judgment would not be inconsistent with the defendants' lack of resistance to partial summary judgment against

Northwood on Counts VI through X and XXI through XXV.[2] This motion requires more extensive analysis than the Vendors' motion for partial summary judgment, because it is both resisted and more far-reaching.

The court will consider the defendants' motion for partial summary judgment as to each kind of claim in turn. However, the court must first address, at least in passing, an issue raised by the Vendors in their resistance to the defendants' motion for partial summary judgment, which is the choice of law applicable to their claims.

### 1. Choice of law

■ In their resistance, the Vendors contend that, *in the event of a conflict,* Iowa choice-of-law rules require the application of Wisconsin law to their claims. In their reply, however, the defendants argue that, contrary to the Vendors' position, Iowa choice-of-law rules require the application of Iowa law to the Vendors' claims. The court concludes that the choice-of-law issue is premature, because the Vendors have not demonstrated that there *is* a "true conflict" between the laws of the nominee states. *See Modern Equip. Co. v. Continental Western Ins. Co., Inc.,* 355 F.3d 1125, 1128 n. 7 (8th Cir.2004) ("If there is not a true conflict between the laws of Nebraska and Iowa on the pertinent issue, then no choice-of-law is re-

quired. *Nesladek v. Ford Motor Co.,* 46 F.3d 734, 736 (8th Cir.1995)."); *Counsul General of Republic of Indonesia v. Bill's Rentals, Inc.,* 330 F.3d 1041, 1045 (8th Cir.2003) ("Before considering any issues of conflict of laws, we must first determine whether " 'there actually is a difference between the relevant laws of the different states.' " *Phillips v. Marist Soc'y of Washington Province,* 80 F.3d 274, 276 (8th Cir.1996) (quoting *Barron v. Ford Motor Co. of Canada, Ltd.,* 965 F.2d 195, 197 (7th Cir.1992))."); *Phillips v. Marist Soc'y,* 80 F.3d 274, 276 (8th Cir.1996) ("[B]efore entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states."); *Harlan Feeders, Inc. v. Grand Labs., Inc.,* 881 F.Supp. 1400, 1405 (N.D.Iowa 1995) (noting that there must be a "true conflict" between the laws of the possible jurisdictions on the pertinent issue before any choice of law need be made). At most, the Vendors have pointed to statements of Wisconsin courts that they believe are more favorable to their positions, not cases from Iowa and Wisconsin that demonstrate a "true conflict" of laws in the two jurisdictions on pertinent issues. In the absence of a "true conflict," the court will apply Iowa law, the law of the forum state, in addressing the issues raised in the defendants' motion for partial summary judgment.[3]

---

**2.** As mentioned above, even if granted, the motion will leave for trial the claims in Counts I through V ("Actions On Account") and XI through XV ("Accounts Stated") against all defendants except Northwood, against which summary judgment on these claims has already been entered above, and Andrew Richey, who has never been served with the complaint.

**3.** The court notes that the parties are correct that Iowa's choice-of-law rules use the "most significant relationship" test to determine the law applicable to a particular claim. *See, e.g., Lyons v. Midwest Glazing,* 265 F.Supp.2d

1061, 1072 (N.D.Iowa 2003). The court also notes, however, that the parties do not appear to have recognized that the factors pertinent to determination of the "most significant relationship" vary depending upon whether the claim at issue is a tort claim or a contract claim. As this court explained in *L & L Builders Co. v. Mayer Associated Servs., Inc.,* 46 F.Supp.2d 875 (N.D.Iowa 1999),

The first step in determining any choice-of-law question is to determine the proper characterization of what kind of case is involved. *Jones Distrib. Co., Inc. [v. White Consol.],* 943 F.Supp. [1445,] 1458 [ (N.D.Iowa 1996) ] (also observing that the

### 2. The "Quantum Valebant" claims

#### a. Arguments of the parties

■ The defendants first seek summary judgment on the Vendors' "Quantum Meruit" claims in Counts VI through X, which the Vendors have recharacterized as "Quantum Valebant" claims. *See Webster Industries I*, 234 F.Supp.2d at 987 (noting this recharacterization) & 991–95 (discussing the defendants' motion to dismiss the claims as recharacterized). Unfortunately, the defendants' motion and briefs in support of their motion do not identify any specific arguments as directed at the viability of the "Quantum Valebant" claims. However, the defendants do make the following argument:

> The undisputed facts are that Plaintiffs had business dealings with only two Defendants: Northwood and its president Andrew Richey. Thus, the only possible legal basis for Plaintiffs' attempt to obtain a judgment against the other Defendants would be by establishing the existence of fraud involving conveyances of Northwood's assets which ultimately were transferred to the other Defendant corporations. The undisputed facts in this case establish that no fraudulent conveyances occurred. Further, the undisputed facts establish that Plaintiffs cannot maintain claims for unjust enrichment, fraud, or RICO.

Defendants' Memorandum Of Law In Support Of Summary Judgment Motion at 4. In contrast, in their resistance, the Vendors argue that the basis for holding all of the defendants liable on the Vendors' "contract" claims is that "the fiction of the corporate defendants' separateness should be ignored," because the Partridge Defendants were "one entity" with Northwood, and SDD was the successor to Partridge River Superior and Northwood. *See* Plaintiffs' Memorandum In Opposition To Defendants' Motion For Partial Summary Judgment at 7–11.

#### b. Analysis

As explained above, the party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548); *see also Rose–Maston*, 133 F.3d at 1107; *Reed*, 7 F.3d at 810. The defendants have plainly not met this burden with respect to the Vendors' "Quantum Valebant" claims, where they made no attempt to identify the precise basis for their contention that they are entitled to summary judgment on those claims. The defendants should not be saved from this failure by the court's attempt to determine what arguments

---

law of the forum controls this question as well); *Harlan Feeders, Inc. [v. Grand Labs., Inc.]*, 881 F.Supp. [1400,] 1404 [ (N.D.Iowa 1995) ] (same). Although Iowa applies the 'most significant relationship test' to conflict-of-laws or choice-of-law questions involving either contract or tort claims, the factors the court is to consider are not identical in the context of torts and contracts. *Harlan Feeders, Inc.*, 881 F.Supp. at 1405.

*L & L Builders Co.*, 46 F.Supp.2d at 881; *see also id.* at 882 ("Iowa courts have adopted the 'most significant relationship' test of the *Restatement (Second) of Conflict of Laws* § 188 for determination of conflict-of-laws

questions pertaining to a contract claim."); *Dethmers Mfg. Co., Inc. v. Automatic Equip. Mfg. Co.*, 23 F.Supp.2d 974, 1002–04 (N.D.Iowa 1998) (noting that Iowa has adopted the "most significant relationship" test of *Restatement (Second) of Conflict of Laws* § 188 for both contract and "quasi-contract" claims, but has adopted the "most significant relationship" test in *Restatement (Second) of Conflict of Laws* § 145 for tort claims); *Harlan Feeders, Inc.*, 881 F.Supp. at 1405–09 (same). However, because no "true conflict" has been shown, the court need not determine, in light of these differing factors, which forum's law applies to the contract and tort claims still pending in this action.

were intended to support their motion for summary judgment on the "Quantum Valebant" claims.

Moreover, even if the court is correct in its assumption that this portion of the defendants' motion for partial summary judgment is premised on the argument that fraudulent transfers must be shown to hold the other defendants liable for Northwood's failure to pay for products, that argument fails. Although proof that separate corporations are being used to promote fraud or illegality is a *factor* that would support a finding that the separate identities of the corporations should be disregarded, that circumstance is not the only one sufficient to permit holding one corporation liable for conduct of another. Indeed, the Iowa Supreme Court dispelled such a notion more than two decades ago in *Team Central, Inc. v. Teamco, Inc.,* 271 N.W.2d 914 (Iowa 1978).

▮ In *Team Central,* one of the defendants challenged the sufficiency of a jury's finding that one corporation " 'is an instrumentality of, or conduit for, and one and the same as [the other]" ' as establishing that two corporations were not separate entities, so that one could be held liable for conduct of the other. *Team Central, Inc.,* 271 N.W.2d at 923 (quoting the special interrogatory to which the jury answered in the affirmative). The Iowa Supreme Court first agreed "that mere identity of stock ownership and corporate management is not alone sufficient to permit a piercing of the corporate veil," but noted that the district court had "detailed twelve circumstances to be considered along with 'all other evidence in the case' in determining if the corporate veil should be pierced."

*Id.* Like the defendants here, the "main thrust" of the defendants' argument in *Team Central* "[wa]s that fraud is an essential element for application of this doctrine," and that the "trial court erred in listing it as a factor but not a necessary one." *Id.* The Iowa Supreme Court found that this argument was "without merit." *Id.* The court explained,

It is true that the corporate veil doctrine is most frequently applied to avoid fraud. However, it is equally appropriate under other circumstances when one corporation is used as a mere sham for the other.

*Team Central, Inc.,* 271 N.W.2d at 923 (citing cases). The court upheld the jury's determination that the "corporate veil" should be pierced, and one corporation could be held liable for conduct of the other, where "[t]here was substantial evidence that [one defendant] was a mere sham for [the other] without real independent existence and that this arrangement was used to do severe, if not irreparable, harm to [the plaintiff] by the tortious conduct previously described." *Id.* The court also rejected the defendant's contention that whether or not the corporate veil should be pierced was a question of law for the court, holding instead that this contention was not a correct statement of the law. *Id.* Thus, even if the record established that there were no fraudulent transfers, or other fraud, as a matter of law, that would not require summary judgment in favor of the defendants (excluding Northwood) on the Vendors' "Quantum Valebant" claims, because there could still be other bases for holding the other defendants' liable for Northwood's conduct.[4]

4. The Iowa Supreme Court has noted that "piercing the corporate veil" is "primarily used to impose personal liability upon the owners, directors, or officers of the corporation attempting to use the corporate entity as an 'intermediary to perpetrate fraud or promote injustice.'" *See Haupt v. Miller,* 514 N.W.2d 905, 908 (Iowa 1994). However, Iowa courts have used "piercing the corporate veil" to refer to at least three different theories under which various defendants in this case could be held liable for the conduct of Northwood in this case: (1) "corporate

Therefore, the portion of the defendants' motion for partial summary judgment seeking summary judgment on the "Quantum Valebant" claims in Counts VI through X will be denied.

### 3. The "Fraudulent Transfer" claims

#### a. Arguments of the parties

The defendants do expressly identify their arguments attacking the viability of the Vendors' "Fraudulent Transfer" claims in Counts XVI through XX of the amended complaint. They contend, and the Vendors agree, that the "Fraudulent Transfer" claims are governed by the Uniform Fraudulent Transfer Act (UFTA), which Iowa adopted in 1995. *See* Iowa Code Ch. 684. The defendants argue that, to establish a "fraudulent transfer," the Vendors must establish that an "asset" was "transferred" within the meaning of the UFTA. They contend that the Vendors cannot establish the "transfer" of any "assets," because under the UFTA (and Iowa common law), property encumbered by a valid lien is not an "asset." The defendants argue that Northwood had no property that was *not* encumbered by valid security interests. They argue that even the products supplied by the Vendors, who were unsecured creditors, became subject to M & I's first-priority security interests as soon as those products were received into Northwood's inventory. The Vendors had notice of M & I's security interests, the defendants contend, from proper filing and perfection of those security interests. In short, the defendants argue that, "[b]ecause there were no 'assets,' a 'transfer' could not have been made," and the undisputed facts thus establish that there were no "fraudulent transfers" under Iowa's version of the UFTA.

The Vendors contend that the defendants have not disputed their contention that the defendants acted with an intent to hinder, delay, or defraud the Vendors by transferring Northwood's assets to the other defendants and to Miner's, Inc. The crux of the Vendors' challenge to the defendants' argument, however, is that there was still "equity" in certain real and personal property held by Northwood, over and above the amount of any lien or security interest at issue, so that such property constituted "assets" within the meaning of the UFTA to the extent of the equity. Consequently, they assert that the items of property were "assets" subject to the UFTA's prohibition on "fraudulent trans-

---

identity," the situation described in *Team Central*, which could establish the liability of the Partridge Defendants for Northwood's conduct, on the basis that the nominally separate entities did not actually have separate corporate identities; (2) "owner, shareholder, director, or officer liability," which could establish the liability of Miner and Richey for conduct of Northwood; and (3) "successor corporation" liability, which could establish SDD's liability for Northwood's conduct. The defendants have not pointed to any authority that "fraudulent transfers" are a necessary element of proof for any of these theories, and indeed, Iowa law is to the contrary. *See, e.g.,* *Team Central, Inc.,* 271 N.W.2d at 923 (establishing that "fraud" is not a necessary element of "corporate identity" liability); *In re Marriage of Ballstaedt,* 606 N.W.2d 345, 349 (Iowa 2000) ("factors that would support" piercing the corporate veil to hold an owner, shareholder, or officer liable "include (1) the corporation is undercapitalized; (2) it lacks separate books; (3) its finances are not kept separate from individual finances, or individual obligations are paid by the corporation; (4) the corporation is used to promote fraud or illegality; (5) corporate formalities are not followed; and (6) the corporation is a mere sham"); *Pancratz v. Monsanto Co.,* 547 N.W.2d 198, 200–01 (Iowa 1996) (identifying four circumstances in which a "successor corporation," *i.e.,* a corporation that purchased the assets of another corporation, may be liable for the predecessor's debts and liabilities, as follows: (1) the buyer agrees to be held liable; (2) the two corporations consolidate or merge; (3) the buyer is a "mere continuation" of the seller; or (4) the transaction amounts to fraud).

fers." The Vendors argue, generally, that the debts secured by liens were not all owed by Northwood, but by Northwood and the Partridge Defendants, so that it is only by combining the secured debts of Northwood and the Partridge Defendants that the defendants come up with a calculation that Northwood's assets were insufficient to cover its secured debts. The Vendors make two more specific arguments. The first is that Miner's, Inc., failed to demand payment on Andrew Richey's personal guarantee of Northwood's debts, and instead took nothing from Richey in return for his release of any claims that he might have had against Northwood's property. The Vendors argue that this course improperly eliminated "equity" that might have existed had Miner's, Inc., called in Richey's guarantee. Their most strenuous argument, however, is that after Miner's, Inc., foreclosed on the other collateral subject to security interests, debts of only about $1.2 million were left unresolved; that prior valuations of Northwood's real property and personal property indicated that it had a fair market value of approximately $2.6 million; that Miner's, Inc., only realized about $1.2 million on that property at the sheriff's sale of the Northwood real property and other sales of Northwood's equipment; and that, as a result of the defendants' failure to obtain full value for Northwood's real property and equipment, the defendants wiped out any potential "fund" to pay unsecured creditors like the Vendors. The Vendors also argue that all of the transactions to foreclose on Northwood's property were "insider" transactions, which failed to obtain fair market value for the property, and which placed the benefit of the "insiders"—Miner family and its holdings—above the interests of any unsecured creditors, such that the foreclosure transactions and other transfers were themselves fraudulent.

The fatal flaw in the Vendors' argument, the defendants contend in their reply, is that the Vendors have failed to put on any evidence to support their argument that the value of the property at issue exceeded the amount of the valid liens. Thus, they contend, there is no basis for finding that the transactions were "fraudulent." More specifically, they point out that the Vendors have no evidence to support their valuation of property, to show that transfers were not for fair market value, or to show that Andrew Richey's personal guarantee of Northwood's debts had any value. Furthermore, they point out that the record shows beyond dispute that there were other secured creditors, who stood in line ahead of the Vendors, but who also have not been paid. Thus, even if the sales had netted more, there would still have been no "assets," because there would still have been no "equity" in property in excess of liens.

#### b. Analysis

##### i. Applicable law.
The Vendors' claims of "Fraudulent Transfers" are pursuant to Iowa's version of the Uniform Fraudulent Transfer Act (UFTA). *See* IOWA CODE CH. 684. Notwithstanding that the Iowa UFTA has been on the books since 1995, *see id.*, there is a dearth of Iowa decisions interpreting its provisions. Therefore, the court must rely on the statutory language itself, assisted, where appropriate, by interpretations of the "uniform" language of the UFTA by courts in other jurisdictions.

The Iowa UFTA defines "transfers" that are "fraudulent" as to present and future creditors, in pertinent part, as follows:

> 1. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if

the debtor made the transfer or incurred the obligation under any of the following circumstances:

a. With actual intent to hinder, delay, or defraud any creditor of the debtor.

b. Without receiving a reasonably equivalent value in exchange for the transfer or obligation, if either of the following applies:

(1) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(2) The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

IOWA CODE § 684.4. The Iowa UFTA also defines transfers that are "fraudulent" only as to present creditors as follows:

1. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

2. A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had

reasonable cause to believe that the debtor was insolvent.

IOWA CODE § 684.5.

"Transfer" is defined under the UFTA as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an *asset* or an interest in an *asset*, and includes payment of money, release, lease, and creation of a lien or other encumbrance." IOWA CODE § 684.1(11) (emphasis added). Thus, a "transfer," and more specifically, a "fraudulent transfer," must involve an "asset." An "asset," in turn, is defined as "property of a debtor," but expressly excludes, *inter alia*, "[p]roperty to the extent it is encumbered by a valid lien." IOWA CODE § 684.1(2)(a).[5] The Iowa Supreme Court adopted the UFTA's definition of "asset" for common law purposes long before the Iowa legislature adopted the UFTA itself. *See First National Bank in Fairfield v. Frescoln Farms, Ltd.*, 430 N.W.2d 432, 436–37 (Iowa 1988) (finding that the UFTA "provides a better definition of assets that should be included in a calculation of solvency," and "adopt[ing] this definition because it assures that a 'solvency' supported by such 'assets' will have some meaning to a creditor, as the property can be reached through the legal process"). Consequently, if a "transfer" involves only property encumbered by a valid lien, it cannot be a "fraudulent transfer" within the meaning of either the UFTA or Iowa common law, because there is no "asset" involved, and if there is no "asset" involved, the intent of the parties to the transfer is irrelevant. *See, e.g., Ed Peters Jewelry Co., Inc. v. C & J Jewelry*, 124 F.3d 252, 261–62 (1st

---

**5.** The complete statutory definition of "asset" is as follows:

2. "Asset" means property of a debtor, but does not include any of the following:
a. Property to the extent it is encumbered by a valid lien.

b. Property to the extent it is generally exempt under nonbankruptcy law.
c. An interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant.
IOWA CODE § 684.1(2).

Cir.1997) (laying out a similar analysis of Rhode Island's version of the UFTA); *accord In re Valente,* 360 F.3d 256, 260–61 (1st Cir.2004) (citing *Ed Peters* and holding that property worth only $150,000, but encumbered by a $168,000 first mortgage as well as a number of state and federal tax liens was not an "asset" under the UFTA).

Moreover, because property is *not* an "asset" *"to the extent* it is encumbered by a valid lien," the plain meaning of the statutory definition of "asset" is that "property of a debtor" *is* an "asset" to the extent it is *not* encumbered by a valid lien, *i.e.,* to the extent that the debtor has any equity in the property. *See, e.g., In re Main, Inc., Debtor,* 1999 WL 689715, *6 n. 7 (E.D.Pa.1999) (concluding that "the difference between the value of Main's assets and the value of Lift's liens would be property of the debtor subject to avoidance under the [UFTA]," because it was not excluded from the definition of an "asset"); *Mussetter v. Lyke,* 10 F.Supp.2d 944, 958–59 (N.D.Ill.1998) ("Uniform case law confirms the self-evident proposition that the unencumbered portion of a debtor's property is an 'asset' for UFTA purposes *(see, e.g., Ransier v. McFarland (In re McFarland),* 170 B.R. 613, 622–23 (Bankr. S.D.Ohio 1994); *Rich v. Rich,* 185 W.Va. 148, 405 S.E.2d 858, 861 (1991))."); *National Loan Investors, L.P. v. World Properties, L.L.C.,* 79 Conn.App. 725, 830 A.2d 1178, 1183 (2003) (property was an "asset" to the extent that the value of the property, $14.5 million, exceeded the valid lien of $5.2 million); *Preferred Funding, Inc. v. Jackson,* 185 Or.App. 693, 61 P.3d 939, 942 (2003) ("[O]nly 'equity in excess of the amount of the encumbering lien(s) is an "asset" under UFTA.'") (quoting *Oregon Account Systems, Inc. v. Greer,* 165 Or. App. 738, 996 P.2d 1025 (2000)); *Telephone Equip. Network, Inc. v. TA/Westchase Place, Ltd.,* 80 S.W.3d 601, 610 n. 6 (Tex. App.—Hous.(1 Dist.)2002) (stating, "[U]n-

der the plain language of the UFTA, the value of Southwest's property in excess of TEN's lien encumbering the property would be an "asset" as defined by UFTA," and citing decisions in other jurisdictions so holding).

The defendants contend that Northwood had no "assets," that is, no property with a value in excess of encumbrances. Essentially, the Vendors assert that there were two "assets" that should have given Northwood equity in excess of encumbrances: (1) Andrew Richey's personal guarantee of Northwood's debts, and (2) Northwood's real property and equipment. The court will consider these purported "assets" in turn.

■ *ii. Richey's personal guarantee.* The analysis of the first issue is necessarily brief: The Vendors have failed to point to any evidence that generates a genuine issue of material fact that Andrew Richey's personal guarantee had any value whatsoever, where they have pointed to no evidence that Richey had any assets of his own. Thus, there is no evidence generating a genuine issue of material fact that the defendants' failure to make a demand on Andrew Richey's personal guarantee resulted in Northwood's secured debts exceeding the value of the property subject to liens. FED. R. CIV. P. 56(e) (the party resisting summary judgment must to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (same). Indeed, the undisputed evidence is that the defendants' decision to release Richey from his guarantee in return for a release of any claims he might have against Northwood only served to eliminate potential claims against Northwood.

■ *iii. Northwood's property.* As to the question of the value of Northwood's

real property and equipment, the court finds that the defendants have met their initial burden on a motion for partial summary judgment to show that there was no property of Northwood that was not encumbered by a valid lien in excess of the value of the property. *See Hartnagel,* 953 F.2d at 395 (the movant for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue") (citing *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548); *see also Rose–Maston,* 133 F.3d at 1107; *Reed,* 7 F.3d at 810. They have done so by showing that foreclosure of the liens against the real property and equipment did not produce any "equity" in excess of the liens against that property. Thus, the question is whether the Vendors have met their burden to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial" on the question of whether Northwood had equity in property in excess of the liens against that property. FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

In an attempt to meet this burden, the only evidence to which the Vendors point is evidence that Northwood's real property and equipment were purportedly valued at $2.6 million, versus remaining secured debt of about $1.2 million, but Miner's, Inc., only bid the amount of Northwood's debt to Miner's, Inc.—about $707,000—for the real property at the sheriff's sale, and only obtained about another $250,000 on the subsequent sale of equipment. The Vendors' assertions concerning the value of the property at issue rely entirely on a letter to creditors from counsel retained by Northwood in connection with a possible Chapter 7 bankruptcy filing. *See* Plaintiffs' Appendix In Opposition To Defendants' Motion For Partial Summary Judgment at 146 (Exhibit 16). That letter states, in pertinent part, "Northwood Doors, Inc. real property, i.e., its plant facility, was most recently appraised in December of 1999 at $2.1 million and, in fact, the plant has been listed for sale with a commercial real estate broker for that amount." *Id.* The letter also states, "Management has estimated that the liquidation value of the personal property of Northwood Doors, Inc.'s assets, including equipment, raw material inventories, supplies, and accounts receivable, to be [sic] $500,000." *Id.* Thus, the letter states a valuation for the real property that was more than two years old, from a time when Northwood was a "going concern," and indicates that, despite being listed for sale at $2.1 million, the real property had not been sold. Therefore, the letter itself suggests that the estimated value of $2.1 million was too high, either for a going concern or for property under liquidation.[6] If that were the extent of the record, however, the Vendors might have succeeded in generating a jury question on the issue of whether the value of Northwood's property exceeded the liens against it.

There is other unrebutted evidence that the valuation of property in counsel's letter is too high, however. Under Iowa's version of the Uniform Commercial Code, "if the sale of collateral is completed in accordance with a judicial proceeding, the sale is conclusively presumed to be commercially reasonable." *Geiger v. Tokheim,* 191 B.R. 781, 791–92 (N.D.Iowa 1996) (citing IOWA CODE § 554.9507(2)); IOWA CODE § 554.9507(2) (stating, in pertinent part, "A disposition which has been approved in any judicial proceeding or by any bona fide

---

**6.** Moreover, the conclusion of counsel in the letter was that, even assuming this valuation of the property, Northwood's secured debts exceeded the value of its property.

creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable."). On the other hand, other jurisdictions have held that a foreclosure sale may itself be deemed to be a "fraudulent transfer" under the UFTA, if the sale can be shown to be "collusive." *See, e.g., Mussetter*, 10 F.Supp.2d at 959. Thus, it would not be appropriate to apply a "conclusive presumption" of commercial reasonableness to a foreclosure sale for real property under the UFTA, even where the foreclosure sale was "in accordance with a judicial proceeding"; however, it would be appropriate to apply a rebuttable presumption in those circumstances.

Here, the Vendors have pointed to no evidence whatsoever suggesting that the foreclosure sale of the Northwood property was "collusive." *Compare id.* (identifying numerous facts demonstrating a "collusive" sale). They also have not pointed to any other evidence undermining the commercial reasonableness of the foreclosure sale. Even if the buyer at the sale, Miner's, Inc., was an "insider" pursuant to the UFTA—based on the Vendors' allegations that Miner's, Inc., "controlled" Northwood, *see* Iowa Code § 684.1(7)(b)(3) (where the debtor is a corporation, an "insider" includes, *inter alia*, "[a] person in control of the debtor")—Miner's, Inc., was also the first-priority lienholder, so that, in the absence of any other bidder, Miner's, Inc., would be expected to bid the amount that would extinguish the liens on the property. Moreover, the Vendors have not challenged the defendants' contentions that the bidding at the foreclosure sale on the Northwood real property was open to ev-

eryone, that other potential bidders were actually present, or that the only party actually to bid at the sale was Miner's, Inc. Thus, the $707,000 that Miner's, Inc., bid for the real property must be presumed to represent the fair market value of the property. The Vendors have done nothing to rebut that presumption.

The Vendors have also failed to generate a genuine issue of material fact on the reasonableness of the price that Miner's, Inc., paid based on evidence that Miner's, Inc., subsequently resold the property for almost $1 million. As the defendants point out, the HUD–1–Uniform Settlement Statement for the subsequent sale demonstrates that *equipment*, as well as the real property, was included in that subsequent sale. *See* Defendants' Supplemental Appendix, Exhibit E. Finally, even that sale for about $1 million would not have demonstrated that there was any equity in the property in excess of the $1.2 million in secured debt, so that the subsequent sale does nothing to suggest that the property involved was an "asset" within the meaning of the UFTA.

Therefore, the defendants are entitled to summary judgment in their favor on the Vendors' "Fraudulent Transfer" claims in Counts XVI through XX of the amended complaint, because the Vendors have failed to generate any genuine issue of material fact that there were any "assets" of Northwood, within the meaning of the UFTA and Iowa common law, that could be "fraudulently" transferred.

### 4. The "Unjust Enrichment" claims

#### a. Arguments of the parties

The defendants have also moved for summary judgment on the Vendors' "Unjust Enrichment" claims in Counts XXI through XXV of the amended complaint.[7]

---

7. Again, the court assumes that this motion is in favor of the defendants other than North-

wood, because the defendants did not oppose

The defendants contend that they are entitled to summary judgment on these counts, because actions taken pursuant to a valid security interest, judgment, or other interest in the property cannot form the basis for a claim for unjust enrichment. They argue that, in this case, the undisputed evidence shows that Miner's, Inc., exercised its rights pursuant to a valid and enforceable security interest in the assets and personal property of Northwood, obtained and executed a foreclosure judgment, purchased Northwood's plant at a sheriff's sale, obtained a sheriff's deed, and later resold the property to a third party, all of which Miner's, Inc., was authorized to do under Iowa law.

The Vendors argue that the defendants have not identified correctly the transactions that are the basis for the Vendors' "Unjust Enrichment" claims. Instead of focusing on the purchase of Northwood's property by a secured creditor, Miner's, Inc., as the defendants seem to think, the Vendors' contend that the present "Unjust Enrichment" claims focus on the transfers of the Vendors' products from Northwood to companies that were inter-related with Northwood without paying the Vendors for those products.

The defendants do not reply to the Vendors' contentions that the defendants have misinterpreted the "Unjust Enrichment" claims.

### b. Analysis

This court recently summarized the nature of an "unjust enrichment" claim under Iowa law, and the elements that must be proved to recover on such a claim, in *Helm Financial Corp. v. Iowa Northern Railway Company,* 214 F.Supp.2d 934 (N.D.Iowa 2002):

summary judgment in the Vendors' favor on the "Unjust Enrichment" claims against

As the Iowa Supreme Court recently explained,

The doctrine of unjust enrichment is based on the principle that a party should not be permitted to be unjustly enriched at the expense of another or receive property or benefits without paying just compensation. *Credit Bureau Enters., Inc. v. Pelo,* 608 N.W.2d 20, 25 (Iowa 2000). Although it is referred to as a quasi-contract theory, it is equitable in nature, not contractual. *See Iowa Waste Sys., Inc. v. Buchanan County,* 617 N.W.2d 23, 29 (Iowa Ct.App.2000). It is contractual only in the sense that it is based on an obligation that the law creates to prevent unjust enrichment. *See id.* at 29–30.

The doctrine of unjust enrichment serves as a basis for restitution. *Smith,* 325 N.W.2d at 94. It may arise from contracts, torts, or other predicate wrongs, or it may also serve as independent grounds for restitution in the absence of mistake, wrongdoing, or breach of contract. See 1 *Dobbs,* § 4.1(1), at 553.

Recovery based on unjust enrichment can be distilled into three basic elements of recovery. They are: (1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances. *See Credit Bureau Enters., Inc.,* 608 N.W.2d at 25; *West Branch State Bank v. Gates,* 477 N.W.2d 848, 851–52 (Iowa 1991).

*State, Dept. of Human Services ex rel. Palmer v. Unisys Corp.,* 637 N.W.2d 142, 154–55 (Iowa 2001) (footnotes omitted) (*Palmer*). The court in *Palmer*

Northwood.

explained that lack of a remedy at law had sometimes been characterized as an element of an "unjust enrichment" claim, but explained, "The adequacy of a legal remedy is a general limitation on the exercise of equity jurisdiction and is properly considered when restitution is sought in equity, but no independent principle exists that restricts restitution to cases where alternative remedies are inadequate." *Palmer*, 637 N.W.2d at 154 n. 2. In addition, in *Palmer*, the Iowa Supreme Court clarified the "critical inquiry" on the second element of such a claim, as follows:

> We recognize unjust enrichment is a broad principle with few limitations. We have never limited this principle to require the benefits to be conferred directly by the plaintiff. *See Iconco v. Jensen Constr. Co.*, 622 F.2d 1291, 1301–02 (8th Cir.1980) (plaintiff not required to show he directly conferred benefit on defendant under Iowa law). Instead, benefits can be direct or indirect, and can involve benefits conferred by third parties. *See I Palmer*, § 1.7, at 40–41, 44. The critical inquiry is that the benefit received be at the expense of the plaintiff. *See Guldberg v. Greenfield*, 259 Iowa 873, 878, 146 N.W.2d 298, 301 (1966).

*Palmer*, 637 N.W.2d at 155.

*Helm Fin. Corp.*, 214 F.Supp.2d at 991–92.

■ It is clear from this overview of the applicable law and review of the amended complaint that the defendants' characterization of the Vendors' "Unjust Enrichment" claims as relating to the purchase by Miner's, Inc., of Northwood's property is simply incorrect. These counts are, instead, premised on allegations that if the defendants are allowed to retain the property transferred as alleged in prior counts and not required to pay the original creditors, they will receive, to their benefit and at the Vendors' expense, the Vendors' la-

bors, efforts, investments, and property. *See* Amended Complaint, Counts XXI through XXV. The "transfers" to which the "Unjust Enrichment" counts refer are the shipments of products from the Vendors to Northwood at issue in the "Actions on Account" (Counts I through V), the "Quantum Valebant" claims (Counts VI through X), and the "Accounts Stated" claims (Counts XI through XV), as well as the "transfers" of assets from Northwood to the Partridge Defendants and from Northwood and the Partridge Defendants to SDD and CHIPS, as alleged in the "Fraudulent Transfer" claims (Counts XVI through XX). *See id.* Thus, the basis for liability of the defendants other than Northwood is that those defendants were so inter-related with Northwood that the separateness of the entities should be disregarded.

In light of this interpretation of the "Unjust Enrichment" claims, it is clear that the defendants have failed to meet their initial burden "to inform[ ] the district court of the basis for its motion and identify[ ] those portions of the record which show lack of a genuine issue" on the "Unjust Enrichment" claims, where the defendants are wrong about the transfers upon which the claims are based. *See Hartnagel*, 953 F.2d at 395 (the movant for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue") (citing *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548); *see also Rose–Maston*, 133 F.3d at 1107; *Reed*, 7 F.3d at 810. Therefore, the defendants' motion for summary judgment on the "Unjust Enrichment" claims in Counts XXI through XXV will be denied.

### 5. The "Corporate Opportunities and Duties" claims

The defendants next seek summary judgment on the Vendors' claims of "Mis-

appropriation of Corporate Opportunity/Breach of Fiduciary Duty/Breach of Duty of Good Faith and Fair Dealing" in Counts XXVI through XXX of the amended complaint. The defendants' basis for summary judgment on these claims is that the court has already granted Michael Miner's motion to dismiss these claims, joined in by Northwood, and "[f]or the same reasons asserted in Michael Miner's motion to dismiss, any remaining shareholder claims should also be dismissed." Defendants' Memorandum Of Law In Support Of Summary Judgment Motion at 4 & n. 1. The court can find no arguments in the Vendors' resistance brief that appear to be responsive to this portion of the defendants' summary judgment motion; therefore, this portion of the defendants' summary judgment motion will be granted. *See* FED. R. CIV. P. 56(e) (the party resisting summary judgment must to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (same).

### 6. The "Fraud" claims

#### a. Arguments of the parties

Next, the defendants have moved for summary judgment on the Vendors' "Fraud" claims in Counts XXXI through XXXV of the amended complaint. The defendants contend that the only allegation of a fraudulent statement is that Northwood allegedly indicated a "willingness to pay for goods purchased," knowing that it could not do so. However, the defendants point out that the last time any of the Vendors shipped goods to Northwood was in October 2001, when Northwood was fully operational and had a revenue source from which to pay its creditors. Thus, the defendants contend that any statements made by Richey or anyone else after Me-dallion Cabinetry withdrew its business from Northwood could not have been for the purpose of obtaining more products or credit from the Vendors. They also point out that no products that originated with the Vendors were shipped from Northwood to Partridge River Superior until the Vendors refused to accept returns of those products, so that there could be no "fraud" in the transfer of products to Partridge River Superior. In short, the defendants contend that the undisputed facts establish that the Vendors cannot satisfy their burden of proving that Richey, or anyone else on behalf of Northwood, made knowing misrepresentations to the Vendors to obtain extended credit or additional products.

The Vendors contend, however, that they can maintain their "Fraud" claims, because the defendants knew that they could not pay the Vendors, but Northwood was allowed to continue soliciting products from them through false claims of upcoming payments. They claim that the critical period for fraudulent statements is not just the few days before Northwood closed its doors in late October 2001, but the whole of 2001, during which Northwood and the Partridge Defendants knew that they could not pay their vendors, but would promise them that they would pay them. The Vendors point to evidence that Dan Popp of Partridge River, Inc., thought this practice was a problem, because it would "mislead vendors"; that Northwood and the Partridge Defendants were running out of cash months before Northwood's collapse and that the entities were using their vendors as a bank; that Northwood was transferring equipment to Partridge River Superior in the summer of 2001; that Richey intended to close Northwood prior to October 1, 2001, but that the management meeting resulted in a "180 degree turn"; and that, after Northwood closed, Richey sent creditors letters promising payment when, to Michael Miner's

knowledge, there was no plan to make repayments.

In reply, the defendants assert that the Vendors have still not pointed to any evidence of their reliance on any representations by Richey or anyone else, or any evidence that their reliance, if any, resulted in damages to them. As to the latter point, the defendants contend that, because there were no assets from which the debts to the Vendors could have been settled, there were no damages to the Vendors, even if Richey's post-closure statements delayed any suit the Vendors might have brought to try to recover on unpaid bills.

### b. Analysis

#### i. Nature of the claims.

Counts XXXI through XXXV of the amended complaint allege that defendant Northwood represented to each Vendor a willingness to pay for goods purchased, and in so doing, obtained goods from that Vendor; that such representations were material, false, known by the "defendants" to be false, and were intended by the "defendants" to deceive each Vendor; and that

each Vendor reasonably relied on the representations of defendant Northwood in extending credit. These counts allege, further, that the false representations of Northwood proximately caused the injuries suffered by each Vendor, including, but not limited to, the reasonable value of all goods sold and services performed for the defendants for which payment has not been received, as well as lost profits, interest, collection costs, legal fees, and costs of bringing this action. These counts are devoid, however, of any specification of the precise nature of the representations; when, by whom, and to whom the representations were made; the factual basis for any belief that the representations were false or known to be false; or when and how the Vendors relied on the representations in extending credit.[8]

Notwithstanding the vagueness of the pleading of the fraud claims, it is apparent that the gravamen of those claims *as pleaded* is that Northwood made false representations of intent to pay for goods to induce the Vendors to supply products on credit *in the first place*, rather than subsequent conduct of the defendants *after* de-

---

**8.** Indeed, were the court presented with a motion to dismiss the "Fraud" claims for failure to state a claim pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, it is highly likely that the claims would be dismissed on the basis of the utter failure to plead fraud with the particularity required by Rule 9(b). *See* FED. R. CIV. P. 9(b); *see also, e.g., Wright v. Brooke Group Ltd.*, 114 F.Supp.2d 797, 832 (N.D.Iowa 2000) (reiterating the requirements for pleading fraud pursuant to Rule 9(b)). Although the "fraud" claims were originally asserted in state court, prior to removal, the Vendors offered and were allowed to file an amended complaint after removal, which made their claims subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *See, e.g., Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 139 F.Supp.2d 1071, 1099 n. 9 (N.D.Iowa 2001). As this court observed in *Schaller Telephone Company,*

There is something counterintuitive about the court being required to consider, on a motion for summary judgment, a claim that it almost undoubtedly would have found insufficiently pleaded on a motion to dismiss. Nevertheless, the matter is currently presented on a summary judgment procedural footing. Thus, the question is whether genuine issues of material fact preclude summary judgment on the claim or whether the defendants are otherwise entitled to summary judgment on the claim as a matter of law. *See* FED. R. CIV. P. 56.

*Schaller Tel. Co.*, 139 F.Supp.2d at 1098 n. 9. The same situation obtains here, where the court must consider pursuant to Rule 56 standards the viability of "Fraud" claims that were inadequately pleaded under Rule 12(b)(6) and Rule 9(b).

livery of the goods. *See, e.g.,* Complaint, Count XXI, ¶ 266 ("Defendant NORTH-WOOD represented to Plaintiff WEB-STER a willingness to pay for goods purchased, and in so doing, obtained goods from Plaintiff WEBSTER."), ¶ 270 ("They [sic] intended Plaintiff WEBSTER to rely on those false representations in order to obtain additional goods from Plaintiff WEBSTER.") & 271 ("Plaintiff WEB-STER reasonably relied on the representations of Defendant NORTHWOOD in extending credit."). The court concludes that it would be improper to construe the "Fraud" claims to challenge some wider range of conduct, where the claims have not been pleaded in compliance with Rule 9(b) of the Federal Rules of Civil Procedure. FED. R. CIV. P. 9(b) ("In averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity.").

It is also apparent that the "fraud" claims at issue here are causes of action at law for damages, rather than equitable claims to rescind a contract or equitable defenses to breach-of-contract claims. See *Dishman v. American Gen. Assur. Co.,* 193 F.Supp.2d 1119, 1124–25 (N.D.Iowa 2002) (distinguishing between an equitable action to rescind a contract based on fraud, fraudulent inducement as an equitable defense to a breach-of-contract claim, and an action at law for damages based on fraud, citing, *inter alia, Hyler v. Garner,* 548 N.W.2d 864 (Iowa 1996), as explaining these distinctions). The court also concludes that the claims at issue here are essentially "broken promises" claims, specifically, broken promises to pay later for goods delivered now. This court has twice considered at length the question of whether Iowa law recognizes a cause of action for fraudulent misrepresentation based on "broken promises" in *Schaller Telephone Co. v. Golden Sky Systems, Inc.,* 139 F.Supp.2d 1071, 1104–06 (N.D.Iowa 2001), and *Brown v. North Cen-*

*tral F.S., Inc.,* 987 F.Supp. 1150, 1157 (N.D.Iowa 1997). In both *Schaller Telephone Company* and *Brown,* this court concluded that, under Iowa law, a statement of intent to perform a future act is actionable if, when the statement is made, the speaker had an existing intent not to perform. *See Schaller Tel. Co.,* 139 F.Supp.2d at 1105; *Brown,* 987 F.Supp. at 1157. Thus, the Vendors' "Fraud" claims are at least colorable under Iowa law, because they allege that Northwood stated an intent to pay later for goods received, but had an existing intent not to perform when the promise was made. The question is whether the Vendors can generate genuine issues of material fact on the elements of such claims.

*ii. Elements of the claims.* As the Iowa Supreme Court recently explained, to establish a claim at law for damages for fraudulent misrepresentation, "a plaintiff must prove (1) defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in reliance on the truth of the representation and was justified in relying on the representation, (7) the representation was a proximate cause of plaintiff's damages, and (8) the amount of damages." *Gibson v. ITT Hartford Ins. Co.,* 621 N.W.2d 388, 400 (Iowa 2001); *In re Marriage of Cutler,* 588 N.W.2d 425, 430 (Iowa 1999) (defining the elements of fraud as including (1) misrepresentation or failure to disclose when under a legal duty to do so, (2) materiality, (3) scienter, (4) intent to deceive, (5) justifiable reliance, and (6) resulting injury or damage). The "knowledge of falsity" and "intent to deceive" elements distinguish an action at law for damages for fraud from an equitable action to rescind a contract, because

"even innocent misrepresentations may be sufficient to support an action for rescission," but they are *not* sufficient to support a fraud action at law for damages. *Hyler*, 548 N.W.2d at 872. The plaintiff must prove the elements of fraudulent misrepresentation by clear and convincing evidence. *In re Marriage of Cutler*, 588 N.W.2d at 430; *see also Ralfs v. Mowry*, 586 N.W.2d 369, 373 (Iowa 1998) (describing the burden as proving the existence of fraud "by clear, satisfactory, and convincing evidence") (citing *Benson v. Richardson*, 537 N.W.2d 748, 756 (Iowa 1995)).

██ The defendants challenge the existence of any evidence of falsity of any alleged representation, the defendants' knowledge of falsity, the Vendors' reliance, and damages from that reliance. In the present circumstances, the court concludes that the Vendors have—albeit just barely—pointed to evidence generating a genuine issue of material fact as to whether or not Northwood was already unable to pay its bills when it promised to pay the Vendors for products shipped to Northwood on credit (falsity of the representation), and that Northwood's representatives knew *at that time* that Northwood would be unable to pay the Vendors when their bills came due (knowledge of falsity). *See* FED. R. CIV. P. 56(e) (the party resisting summary judgment must go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Those genuine issues of material fact arise from evidence that Northwood representatives were already concerned that Northwood was or soon would be unable to pay its bills well before Medallion Cabinetry withdrew its business and that Northwood representatives discussed the company's need to rely on its vendors to extend credit to get Northwood through the bad patch.

Similarly, the court concludes that the Vendors have generated genuine issues of material fact on their actual reliance on misrepresentations, whether or not that reliance was justifiable, and damages resulting from that reliance, where they have pointed to evidence that they shipped goods on credit in reliance on promises to pay, but were not paid. *See id.* (resisting party's burden to defeat summary judgment). The defendants have pointed to no evidence showing that the Vendors should have known that Northwood could not pay for the goods when they first extended credit to Northwood or showing that the Vendors were not damaged by reliance on Northwood's representations where they were not paid—indeed, the defendants' arguments concerning lack of reliance and lack of damages from reliance do not relate to the pre-collapse transactions and representations that the court finds actually are pleaded as the basis for the Vendors' "Fraud" claims. Thus, it is the defendants who have failed to carry their initial burden to obtain summary judgment on the "reliance" and "damages from reliance" elements of the Vendors' "Fraud" claims. *See Hartnagel*, 953 F.2d at 395 (the movant for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue") (citing *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548); *see also Rose–Maston*, 133 F.3d at 1107; *Reed*, 7 F.3d at 810.

While the court has little doubt that it would find against the Vendors on this claim, if it were the trier of fact, it is not the court's role on a motion for summary judgment to decide the truth of the matters presented, and the Vendors have presented just enough evidence to generate a fact question for the jury on their "Fraud" claims. *See Quick*, 90 F.3d at 1376–77 (on a motion for summary judgment, the trial

judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial). Therefore, the defendants' motion for summary judgment on the Vendors' "Fraud" claims in Counts XXXI through XXXV will be denied.

### 7. The "RICO" claims

#### a. Arguments of the parties

Finally, the court turns to the defendants' motion for summary judgment on Counts XXXVI through XL of the amended complaint, which allege claims pursuant to the "Racketeer Influenced and Corrupt Organization Act (RICO)." Although the defendants made no challenge to the adequacy of the Vendors' pleading of their "Fraud" claims, the defendants's first challenge to the "RICO" claims is that the claims have not been adequately pleaded under Rule 9(b) of the Federal Rules of Civil Procedure. Specifically, the defendants contend that the Vendors have not pleaded any details as to the time, place, and content of false representations, or the identity of the person making the misrepresentation and what was obtained or given up thereby. The defendants also point out that the claims do not specify what provisions of the Iowa Business Corporation Act or Uniform Commercial Code the defendants have allegedly violated. Even if the claims satisfy the heightened pleading requirements of Rule 9(b), the defendants still contend that summary judgment in their favor is appropriate on these claims, because the Vendors cannot establish the existence of a predicate act for a RICO claim, either in the form of fraudulent transactions, where all transactions involved property that was security for

debts, or mail fraud, where no mailing contained a fraudulent representation. Next, the defendants assert that the Vendors cannot establish any "pattern" of racketeering activity, either in terms of number, relatedness, or continuity of predicate acts, and the undisputed facts show that any "scheme" lasted at most four months prior to the last delivery of goods by the Vendors.

The Vendors contend that they can establish a RICO claim, because they can establish violations of the UFTA, involving a series of fraudulent transactions spanning the time from their first shipments in 2001 through the setting up of SDD in April of 2002, as well as related acts of mail fraud.[9] They argue that it is not necessary that statements in a mailing be fraudulent, as the defendants contend, if the mailings were designed to lull the recipient into a false sense of security, postpone inquiries, or hide the appearance of fraud. There is evidence of such mailings, they contend, in the form of letters from Andrew Richey promising a repayment scheme that did not exist and letters to creditors from Northwood's bankruptcy counsel painting a false picture of insufficient assets to cover secured debts. They also assert that the scheme lasted more than a year, because it involved fraudulent transfers from mid-2001 through the sale of assets in 2003 by Miner's, Inc., that gave Miner's, Inc., a profit, but provided no benefit to unsecured creditors.

In reply, the defendants point out that the Vendors have not even attempted to demonstrate the sufficiency of their pleadings to meet the heightened pleading requirements for RICO claims. They also

---

**9.** The Vendors apparently have abandoned their allegations in their complaint that "predicate acts" included violations of the Iowa Business Corporations Act and the Uniform Commercial Code, because they make no reference to these allegations in their resistance to the defendants' assertions that the Vendors cannot generate genuine issues of material fact on any "predicate acts."

contend that the letters to which the Vendors point were not part of a scheme to commit any fraudulent transactions, but that even giving the Vendors the benefit of all doubts, the last allegedly fraudulent act would have been Richey's letter to the Vendors in December 2001, so that the supposed "scheme" simply didn't last long enough to satisfy the requirements of a RICO claim.

### b. Analysis

**i. Elements of the RICO claims.** The Vendors do not make clear, in either their complaint or their resistance to summary judgment, the precise nature of their RICO claims. However, it appears that they are pleading claims of conduct in violation of 18 U.S.C. § 1962(c). Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering or collection of unlawful debt." 18 U.S.C. § 1962(c). Persons injured "by reason of" a § 1962 violation have standing to bring a civil suit pursuant to 18 U.S.C. § 1964(c). *See Fogie v. THORN Americas, Inc.,* 190 F.3d 889, 894 (8th Cir.1999). To prove such a claim, "a RICO plaintiff must prove the defendant 'engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Asa–Brandt, Inc. v. ADM Investor Servs., Inc.,* 344 F.3d 738, 752 (8th Cir.2003) (quoting *Handeen v. Lemaire,* 112 F.3d 1339, 1347 (8th Cir.1997)); *In re Sac & Fox Tribe of the Mississippi in Iowa/Meskwaki Casino Litigation,* 340 F.3d 749, 767 (8th Cir.2003) ("To state a claim under § 1962(c), a plaintiff must establish (1) the existence of an enterprise; (2) conduct by the defendants in association with the enterprise; (3) the defendants' participation in at least two predicate acts of racketeering; and (4)

conduct that constitutes a pattern of racketeering activity. *United HealthCare Corp. v. American Trade Ins. Co.,* 88 F.3d 563, 570 (8th Cir.1996).").

**ii. Pleading requirements for the RICO claims.** Among other things, the Vendors must have adequately pleaded a "pattern of racketeering activity," *i.e.,* a "pattern" of "predicate acts." 18 U.S.C. § 1962(c); *Abels v. Farmers Commodities Corp.,* 259 F.3d 910, 918 (8th Cir.2001). "There are two issues here that should be kept distinct: whether the plaintiffs have sufficiently pleaded acts of racketeering, and whether those alleged acts can be said to form a pattern." *Abels,* 259 F.3d at 919. Thus, a heightened pleading standard pursuant to Rule 9(b) of the Federal Rules of Civil Procedure applies when the "predicate acts" alleged are acts of fraud; however, "particularized allegations" are not needed in order to determine whether a "pattern" exists, that is, to determine whether there are any facts that the plaintiffs could plead that would connect the "predicate acts" to the "pattern." *See id.* (clarifying *Murr Plumbing, Inc. v. Scherer Bros. Fin.,* 48 F.3d 1066 (8th Cir.1995)). As to pleading of "predicate acts" of fraud, Rule 9(b) requires that the plaintiff "specifically allege the 'circumstances constituting fraud,' Fed.R.Civ.P. 9(b), including 'such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" *Id.* at 920 (quoting *Bennett v. Berg,* 685 F.2d 1053, 1062 (8th Cir.1982), *adhered to on reh'g,* 710 F.2d 1361 (8th Cir.) (*en banc* ), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983)); *accord Murr Plumbing, Inc.,* 48 F.3d at 1069.

"Predicate acts" making up a "pattern of racketeering activity" may include mail fraud, as proscribed by 18

U.S.C. § 1341, and wire fraud, as proscribed by 18 U.S.C. § 1343. *Abels*, 259 F.3d at 918. These "fraud" offenses would necessarily be subject to the heightened pleading standards of Rule 9(b). *See id.* Because the conduct constituting these offenses may vary widely, "[a] plaintiff may, but need not, allege that a defendant made misrepresentations of fact," and "no misrepresentations need be transmitted by mail or wire: even routine business communications in these media may suffice to make a scheme of false dealing into a federal offense." *Abels*, 259 F.3d at 918; *see also Atlas Pile Driving Co. v. DiCon Financial Co.*, 886 F.2d 986, 992 (8th Cir. 1989) ("[A] mailing [that serves as an element of mail fraud] may be a routine mailing or even one that is sent for a legitimate business purpose so long as it assists in carrying out the fraud") (internal quotations omitted). Because the Vendors have identified certain mailings that they assert furthered a fraud, even if those mailings did not contain misrepresentations, the Vendors have identified some conduct that could constitute "predicate acts" for purposes of their RICO claims.

■ On the other hand, "fraudulent transfers" as defined by the UFTA are not criminal offenses identified as "racketeering activity" in 18 U.S.C. § 1961(a). *Cf. Wisdom v. First Midwest Bank of Poplar Bluff*, 167 F.3d 402, 406 (8th Cir.1999) (holding that Truth In Lending Act violations were not in the list of "racketeering activities" in § 1961(1), and so could not be a "predicate act" for purposes of a civil RICO claim). Therefore, even if adequately pleaded, such "fraudulent transfers" would not support the Vendors' "RICO" claims. Furthermore, where the court concluded, above, that the Vendors failed to generate any genuine issues of material fact that there were any "fraudulent transfers," no mailings related to such transfers could form the basis for a "mail fraud" predicate act. The "mail fraud" predicate acts must, therefore, be based on the only other "fraud" alleged, which is a fraudulent statement of Northwood's intention to pay later for goods shipped to Northwood by the Vendors.

■ Thus, the question is whether or not the Vendors adequately pleaded any underlying fraud to which any mailings related. *See Abels*, 259 F.3d at 918–19 (the heightened pleading standards of Rule 9(b) apply to pleading of "predicate acts" for a RICO claim, but the pleading of a "mail fraud" predicate act does not require an allegation that the mailing itself contained a fraudulent statement, only that the mailing related to the fraud); *Atlas Pile Driving Co.*, 886 F.2d at 992 (the mailing must have "assisted" the fraud). From review of the pleading of the RICO claims and the underlying "frauds" identified in those claims, the answer, quite obviously, is no. The Vendors' pleadings do not identify the "time," or "place"—or even the method, means, or mode—of any misrepresentations, or the identity of anyone who purportedly made such misrepresentations, concerning Northwood's intention to pay for goods after receiving them. *See id.* at 920 (the plaintiff must "specifically allege the 'circumstances constituting fraud,' Fed.R.Civ.P. 9(b), including 'such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby'") (quoting *Bennett*, 685 F.2d at 1062). No *specific* incidence of a pertinent representation is identified anywhere in the amended complaint; indeed, the complaint does not even allege that any such representations were conveyed by "mail" or "wire," or identify any mailings that "assisted" in the original "fraudulent" promises to pay for goods delivered on credit.

Therefore, the defendants are entitled to summary judgment on the Vendors' "RICO" claims in Counts XXXI through XXXV of the amended complaint on the ground that the Vendors have not pleaded the underlying "fraud" predicate acts with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.

■ *iii. Supporting evidence.* In addition, or in the alternative, the defendants also assert that the Vendors cannot generate genuine issues of material fact on any "predicate acts" or any "pattern" of predicate acts sufficient to sustain their "RICO" claims. *See Asa–Brandt, Inc.,* 344 F.3d at 752 (proof of a RICO claim requires, *inter alia,* proof of a "pattern" of "racketeering activity"). The Vendors rely on a "pattern" of mail fraud and "fraudulent transfers" in violation of the UFTA. However, as noted above, "fraudulent transfers" as defined by the UFTA are not criminal offenses identified as "racketeering activity" in 18 U.S.C. § 1961(1). *Cf. Wisdom,* 167 F.3d at 406 (conduct not in the list of "racketeering activities" in § 1961(1) could not be a "predicate act" for purposes of a civil RICO claim). Therefore, "fraudulent transfers" do not support the Vendors' "RICO" claims, and the Vendors consequently must rely entirely on predicate acts of "mail fraud" to establish the necessary "pattern." *See id.* (where certain wrong-doing was not identified as "racketeering activity" under § 1961(1), the plaintiff had to rely only on "predicate acts" that were so defined to establish the

"pattern" element).[10] Thus, in this case, if there is no "mail fraud," there are no "predicate acts" to support the allegations of racketeering under RICO. *Blue Dane Simmental Corp. v. American Simmental Ass'n,* 178 F.3d 1035, 1042 (8th Cir.1999).

The only "mailings" identified by the Vendors *in the summary judgment record* in support of their "RICO" claim—none are identified in their complaint—are letters from Andrew Richey promising a repayment scheme that allegedly did not exist and letters to creditors from Northwood's bankruptcy counsel painting an allegedly false picture of insufficient assets to cover secured debts. The mailing by bankruptcy counsel plainly relates to the Vendors' untenable allegation of "fraudulent transfers," which, as explained above, are neither "predicate acts" under RICO, nor supported by the record, where the letter related to transfers involving only property subject to valid liens. Thus, the Vendors' "RICO" claims must stand on Richey's correspondence as the alleged "predicate acts" of "mail fraud." The Vendors point to nearly identical letters, each dated December 27, 2001, to Kretz Lumber, Plaintiffs' Appendix at 192, Webster Industries, Plaintiffs' Appendix at 219, and Hart Tie & Lumber Company, Plaintiffs' Appendix at 228, in which Richey stated, *inter alia,* that Northwood has "formulated a plan, which will permit us to resume payments on your account and ask that we work together to get these payments initiated as soon as possible."

---

10. Even if "fraudulent transfers" could be considered "predicate acts" for purposes of a RICO claim, the court determined above that the Vendors had failed to generate genuine issues of material fact that any "fraudulent transfers" occurred. Instead, the supposed "fraudulent transfers" involved property subject to liens by creditors. In *Sinclair v. Hawke,* 314 F.3d 934 (8th Cir.2003), the Eighth Circuit Court of Appeals observed, "'Bankers do not become racketeers by act-

ing like bankers.' *Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank,* 934 F.2d 976, 981 (8th Cir.1991). Likewise, bank regulators do not become racketeers by acting like aggressive regulators." *Sinclair,* 314 F.3d at 943–44. A logical extension of these principles is that lienholders do not become racketeers by acting like lienholders. Therefore, actions involving only property subject to liens could not be "predicate acts" for purposes of RICO.

These letters did not "assist[ ] in carrying out" the *original* fraud, *see Atlas Pile Driving Co.,* 886 F.2d at 992, where the Vendors had *already* shipped products on credit, based on *prior* promises of payment. Rather, the few mailings that the Vendors identify were all sent after the Vendors had already delivered goods to Northwood on credit. However, those mailings may have helped *to disguise* the prior fraud. Therefore, construing the record very much in favor of the Vendors, the Vendors may have generated genuine issues of material fact that there were predicate acts of "mail fraud."

Even so, to sustain a RICO claim, there must also be a "pattern" of racketeering activity. *See Asa–Brandt, Inc.,* 344 F.3d at 752 (stating the elements of a RICO claim). The Eighth Circuit Court of Appeals has explained the "pattern" element as follows:

> The pattern element "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5); *see also H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 237–38, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). However, a mere allegation of two or more acts is insufficient to state a RICO claim; the predicate acts must be related and must "amount to or pose a threat of continued criminal activity." *See United HealthCare Corp. v. American Trade Ins. Co., Ltd.,* 88 F.3d 563, 571 (8th Cir.1996) (quoting *H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. 2893). The relationship prong of the pattern element is satisfied if the predicate acts " 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Handeen v. Le-*

*maire,* 112 F.3d 1339, 1353 (8th Cir. 1997) (quoting *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. 2893). The second prong, continuity, can be either closed-ended or open-ended. Closed-ended continuity involves "a series of related predicates extending over a substantial period of time;" open-ended continuity involves acts which, by their nature, threaten repetition into the future. *See H.J. Inc.,* 492 U.S. at 241–42, 109 S.Ct. 2893. Multiple predicates within a single scheme are encompassed within the RICO statute as long as the relationship and continuity elements are met. *See id.* at 237, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195; *Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank,* 934 F.2d 976, 981 (8th Cir.1991).

*Wisdom,* 167 F.3d at 406; *Handeen v. Lemaire,* 112 F.3d 1339, 1343 (8th Cir. 1997) ("It is by now familiar doctrine that a pattern of racketeering activity is present only when predicate acts are linked by 'continuity plus relationship.' ") (quoting *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)).[11]

██ The "continuity" requirement generally requires proof that the predicate acts extended over a closed period of at least a year. *Handeen,* 112 F.3d at 1353 (citing its recognition in *Primary Care Investors, Seven, Inc. v. PHP Healthcare Corp.,* 986 F.2d 1208, 1215 (8th Cir.1993), that other circuits have so held). Otherwise, the "pattern" must meet the definition of "open-ended continuity," which requires that the conduct " 'involve a distinct *threat* of long-term racketeering activity.' " *Id.* (quoting *H.J.,* 492 U.S. at 242, 109 S.Ct. 2893, with emphasis added in *Han-*

---

11. As the Eighth Circuit Court of Appeals has explained, "The enterprise is not the pattern of racketeering activity. Rather, the enterprise must have a common or shared pur- pose, some continuity of personnel, and an ascertainable structure distinct from the pat- tern of racketeering." *Asa–Brandt, Inc.,* 344 F.3d at 752 (internal citations omitted).

*deen* ); *accord Wisdom,* 167 F.3d at 406. Here, there is no evidence of "open-ended continuity," *i.e.,* no threat of repetition in the future, *see id.,* because Northwood has ceased operations, Richey has disappeared, and the Vendors have instituted suit to recover their losses. Thus, the Vendors must generate genuine issues of material fact that there was a "closed-ended" pattern that extended over a substantial period of time. *Id.* While the Vendors assert that nearly everything the defendants have done, from the allegedly "fraudulent transfers" in mid–2001 through the sale of assets in 2003 by Miner's, Inc., is part of the "pattern," what is required is a "pattern" of "predicate acts." Again, in this case, those "predicate acts" must be acts of "mail fraud." All of Richey's letters allegedly constituting the predicate acts of mail fraud were sent on the same day, and thus, do not establish a pattern extending over a "substantial" period of time. Even were the court to link those letters back to the original "broken promises" fraud that allegedly occurred some six months earlier, the alleged "pattern" falls well short of the one-year rule of thumb for a RICO "pattern." *Handeen,* 112 F.3d at 1353. Thus, even if a reasonable jury could find "relationship," it could not find sufficient "continuity" to establish a "pattern" of "predicate acts" in support of a RICO claim.

Therefore, the defendants are also entitled to summary judgment in their favor on the Vendors' "RICO" claims in Counts XXXVI through XL of the amended complaint on the alternative ground of failure to generate genuine issues of material fact on the elements of their "RICO" claims.

### III. CONCLUSION

The court cannot conclude that either the Vendors' or the defendants' view of the this case is the only one supportable on the record evidence as a matter of law. Although certain claims are subject to summary judgment, others must be submitted to a jury.

THEREFORE,

1. The Vendors' December 9, 2003, unresisted motion for partial summary judgment (docket no. 58) is **granted**. Summary judgment is granted in favor of the Vendors and against defendant Northwood Doors, Inc., on the Vendors' claims in Counts I through V ("Actions on Accounts"), Counts VI through X ("Quantum Valebant"), Counts XI through XV ("Accounts Stated"), and Counts XXI through XXV ("Unjust Enrichment") in the following amounts:

   a. In favor of Webster Industries in the amount of $253,352.05;

   b. In favor of Kretz Lumber in the amount of $78,434.34 plus statutory interest after January 2, 2002;

   c. In favor of Woodline Manufacturing in the amount of $99,154.91 plus late fees at the rate of 24% per annum from and after October 16, 2001;

   d. In favor of Wycombe Wood Products in the amount of $68,667.64; and

   e. In favor of Hart Tie & Lumber Company in the amount of $118,866.16.

2. The defendants' December 12, 2003, motion for partial summary judgment (docket no. 59) is **granted in part** and **denied in part**, as follows:

   a. The motion is **denied** as to the Vendors' "Quantum Valebant" claims in Counts VI through X as to all defendants except Northwood Doors, Inc.;

   b. The motion is **granted** as to the Vendors' "Fraudulent Transfer" claims in Counts XVI through XX;

   c. The motion is **denied** as to the "Unjust Enrichment" claims in Counts XXI through XXV;

   d. The motion is **granted** as to the Vendors' claims of "Misappropriation of Corporate Opportunity/Breach of Fidu-

ciary Duty/Breach of Duty of Good Faith and Fair Dealing" in Counts XXVI through XXX;

d. The motion is **denied** as to the Vendors' "Fraud" claims in Counts XXXI through XXXV; and

e. The motion is **granted** as to the Vendors' "RICO" claims in Counts XXXVI through XL.

3. Consequently, this matter will proceed to trial on April 19, 2004, on Counts I through XV ("Actions on Accounts," "Quantum Valebant," and "Accounts Stated") and Counts XXI through XXV ("Unjust Enrichment") against all defendants except Northwood Doors, Inc., and Andrew Richey, who has never been served, and on Counts XXXI through XXXV ("Fraud") against all defendants except Andrew Richey. A key issue on each of these claims will be whether other defendants can be held liable for any wrongdoing by defendant Northwood.

**IT IS SO ORDERED.**